No. DA 06-0121

IN THE SUPREME COURT OF THE STATE OF MONTANA

2007 MT 166

DOUGLAS GERALD ANDERSON,
RUTH M. ANDERSON AS TRUSTEE
OF THE RUTH M. ANDERSON LIVING
TRUST, DAVAR GARDNER and
TODD GARDNER,

        Plaintiffs and Respondents,

    v.

JOHN STOKES; Z-600, INC.; and
SKYLINE BROADCASTERS, INC.,

        Defendants and Appellants.

APPEAL FROM:    The District Court of the Eleventh Judicial District,
                  In and For the County of Flathead, Cause No. DV 2001-023(C),
                  Honorable Stewart E. Stadler, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Wade J. Dahood, Knight, Dahood, Everett & Sievers, Anaconda, Montana

        For Respondents:

                James H. Goetz, Trent M. Gardner, Goetz, Gallick & Baldwin, P.C.,
                Bozeman, Montana

                David M. Sandler, Bothe & Lauridsen, P.C., Columbia Falls, Montana

Submitted on Briefs:  November 22, 2006

Decided:  July 11, 2007

Filed:

_____
                      Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      John Stokes, Z-600, Inc., and Skyline Broadcasters, Inc. (collectively, "Stokes") appeal from the District Court for the Eleventh Judicial District, Flathead County, which granted summary judgment in favor of Douglas G. Anderson, Ruth M. Anderson as trustee of The Ruth M. Anderson Living Trust, Davar Gardner, and Todd Gardner (collectively, "the Andersons").  We affirm.

¶2      The issues on appeal are as follows:

1.  Are the Andersons' claims barred on equitable grounds?

2. Did the District Court err in its construction of the instrument by which the Andersons' predecessors in interest granted an easement to Stokes's predecessors in interest?

3. Did the District Court err in ordering Stokes to bury the wires, ground radial antennas, conduits, and transmission lines at issue here to a minimum depth of 12 inches?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3      Stokes is the owner and operator of radio station KGEZ (also known as "The Edge"), the building housing the station, and the land on which it sits, all of which are located a short distance south of Kalispell, Montana.  The Andersons are the owners of adjoining land north, south, and east of the station.  The dispute in this case concerns the location and scope of an easement granted by the Andersons' predecessors in interest, J.R. Anderson and Anna G. Anderson ("J.R. and Anna"), to Stokes's predecessor in interest and then-owner of KGEZ, Donald C. Treloar ("Treloar").

¶4      The relevant language of the grant, dated October 11, 1949, provides as follows:

2

WHEREAS, it is the desire of the said grantee [Treloar] to expand and reconstruct the facilities and equipment of said radio station KGEZ and in such expansion and reconstruction program it is the desire of the said grantee to erect and maintain certain radio towers, guy wires, ground and feed wires and conduits on certain portions of the hereinafter described lands, the exact location of which it is now impossible to determine; and,

WHEREAS, the said grantors [J.R. and Anna] have agreed . . . to grant to the said grantee the perpetual right and easement to construct, erect, operate and maintain radio towers, guy wires and ground and feed wires and conduits upon and over the hereinafter described lands;

NOW, THEREFORE, . . . the said grantors do hereby grant unto the said grantee, his heirs and assigns the perpetual right and easement to erect, construct, operate and maintain radio towers, guy wires and ground and feed wires and conduits in, upon, over and through those certain lands situate in the County of Flathead, State of Montana, more particularly described as follows, to-wit:

The North Half of the Southwest Quarter (N½SW¼), the Southwest Quarter of the Northwest Quarter (SW¼NW¼) all in Section Twenty-eight (28), Township Twenty-eight (28) North, Range Twenty-one (21) West; also, all of Cliffords Addition to Demersville, being the Southeast Quarter of the Northwest Quarter (SE¼NW¼) said section, township and range.

The said grantee shall have the right to select the place or places at which the above described facilities shall be erected and maintained and shall have the right to do whatever may be requisite or convenient for the enjoyment of the rights hereby granted, including the right of clearing said land, the removal of barriers and obstructions thereon, and the perpetual right on [sic] ingress and egress to and from said lands for the purpose of erecting, maintaining, repairing, renewing, altering, removing and restoring said radio facilities and equipment when desired by the said grantee his heirs and assigns;

The said grantors, their heirs or assigns are to fully use and enjoy said premises except for the easement and rights hereby granted and the said grantee for himself, his heirs or assigns hereby covenants to bury all wires and conduits capable of such burial to a depth of not less than 12 inches, so that the same will not unduly interfere with the cultivation of said premises, and to fence all towers and/or guy wires for their protection against livestock . . . .

3

¶5    Treloar ultimately selected a site for the radio towers and built two towers with a corresponding transmission line, wires, conduits, and ground radial antennas on that site in the early 1950s. The towers and ground radial antennas have remained at that location since their construction.

¶6    Stokes purchased KGEZ in April 2000. Shortly thereafter, he advised the Andersons that he intended to enlarge or relocate the radio towers. In Stokes's view, the easement granted by J.R. and Anna covered all of the land described in the grant (160 acres). By contrast, the Andersons believed that the easement covered only the specific portion of land that Treloar selected in the early-1950s and on which the radio towers ultimately were built (roughly 31 of the 160 acres).

¶7    In addition to this disagreement as to the location and scope of the easement, the Andersons requested that Stokes bury the existing wires and conduits to a depth of at least 12 inches, fence the towers and guy wires that were not currently fenced, and repair the existing fences that were in disrepair. However, Stokes took the position that the Andersons' agricultural activities had pulled the wires above 12 inches in depth and that the Andersons, therefore, were responsible for reburying them. He also claimed that the fencing provision of the easement grant did not apply because the Andersons did not have livestock on the subject property.

¶8    Douglas G. Anderson and Ruth M. Anderson as trustee of The Ruth M. Anderson Living Trust initiated the instant action on January 12, 2001. Davar Gardner and Todd Gardner later joined as plaintiffs pursuant to M. R. Civ. P. 19(a)(2) and adopted all of the

4

allegations in Douglas and Ruth's complaint. Under Count I of their complaint, the Andersons sought extinguishment of the easement due to Stokes's alleged "failure to keep the improvements on the easement in repair, refusal to repair the improvements on the easement, and noncompliance with the easement." Alternatively, the Andersons sought declaratory relief as to the location and scope of the easement (Count II) and injunctive relief requiring that Stokes comply with the terms of the easement grant (Count III). With respect to Count II, the Andersons alleged that "[t]he place of the easement was permanently set in the early to mid 1950s when Treloar selected the place on which to build the radio towers and, thereafter, built the radio towers on that place."

¶9 Stokes answered the complaint. He denied the Andersons' interpretation of the granting language, alleging instead that the easement covers the entire parcel of land described in the grant and that the towers and ground radial antennas "can be expanded upon or relocated anywhere within the entire parcel, as necessary to accommodate the operation of [Stokes's] radio station." Stokes further alleged that the existing main transmission line was not capable of being buried, that the Andersons were responsible for reburying any wires or conduits that were not at a depth of at least 12 inches due to the Andersons' agricultural activities, and that the Andersons had no reason to enforce the fencing provision of the easement grant because that provision is to protect Stokes, not the Andersons. (Stokes also asserted counterclaims that ultimately were compromised and settled on the merits and are not at issue here.)

¶10 On October 29, 2002, the District Court granted the Andersons' motion for partial summary judgment on Count II and denied Stokes's motion for summary judgment on

5

Count II. The court determined that J.R., Anna, and Treloar had intended the easement to be restricted to "certain portions" of the lands described in the grant, not to encompass all of those lands. Further, the court determined that only Treloar, and not his heirs or assigns, had the right to choose the place or places to erect the radio towers. Finally, the court determined that Treloar's selection and use of the place where the radio towers now stand fixed the location and scope of the easement to that place. "Thus, if [Stokes] propose[s] to enlarge the towers, add towers or move them to another location, such actions exceed the scope of the easement and are not permitted unless [the Andersons] agree thereto." Stokes thereafter filed a "Motion and Brief to Alter and Amend Order of October 29, 2002," which the court denied.

¶11    On September 29, 2005, the District Court granted the Andersons' motion for summary judgment on Count III and denied Stokes's cross-motion for summary judgment on the theory of laches. The court noted that the Andersons had presented evidence that at the time Stokes acquired KGEZ, all lines (radial antennas, conduits, transmission lines, and wires) were capable of being buried and historically had been buried. The court further noted that Stokes had presented "no evidence [to raise a material issue of fact] beyond counsel's argument to rebut [the Andersons'] evidence that the transmission line and any other lines are capable of being buried." The court determined, based on the "uncontroverted admissible evidence," that the exposed condition of the wires and conduits and Stokes's threats of legal action against the Andersons had disrupted the Andersons' use of the land in question for agricultural purposes. However, rather than extinguish the easement, as the Andersons had requested

6

under Count I, the court determined that since the lines are capable of being buried, "the better approach" would be to require Stokes to bury them and otherwise comply with the terms of the easement grant. The court therefore ordered Stokes to do so. Finally, the court rejected Stokes's arguments based on the doctrine of laches, reasoning that Stokes had not shown prejudice by any delay on the part of the Andersons in enforcing the terms of the easement grant.

¶12 Having prevailed on Counts II and III, the Andersons filed a motion to dismiss Count I without prejudice. In addition, the Andersons requested that the court enter final judgment and, further, that the court incorporate in its final judgment Certificate of Survey 2829, filed March 17, 1977, as Instrument Rec. No. 3157, records of Flathead County, Montana ("COS 2829"). This survey, which was commissioned by a former owner of KGEZ, designates the location of the radio towers and radial antennas as "Tract 2," an area comprising 31.288 acres. The Andersons argued that defining the easement according to the terms of COS 2829 would "avoid any disputes between parties as to the actual area covered by the present towers, and accordingly the size of the easement."

¶13 The District Court entered final judgment on December 27, 2005. The court granted the Andersons' motion to dismiss Count I without prejudice and also granted their request concerning COS 2829. With respect to the latter, the court explained (in a separate order) that the Andersons and Stokes have, at all times, agreed that the towers, lines, and conduits have remained in the same location since the inception of the station and that Stokes had offered no reason why COS 2829 was inadequate or deficient. The court accordingly took judicial notice of COS 2829 and incorporated COS 2829 into its

final judgment, specifying that "[t]he Easement is limited in size and location to the historical location of the present towers, described as Tract 2 on [COS 2829]."

¶14 Stokes now appeals from the District Court's orders and final judgment.

**STANDARD OF REVIEW**

¶15 We review a district court's ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. *Redies v. Attorneys Liability Protection Soc.*, 2007 MT 9, ¶ 26, 335 Mont. 233, ¶ 26, 150 P.3d 930, ¶ 26; *Montana-Dakota Util. Co. v. City of Billings*, 2003 MT 332, ¶ 6, 318 Mont. 407, ¶ 6, 80 P.3d 1247, ¶ 6. Rule 56(c) provides that a motion for summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences that might be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment. *Redies*, ¶ 26; *Porter v. Galarneau*, 275 Mont. 174, 179, 911 P.2d 1143, 1146 (1996). Summary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact. *In re Dorothy W. Stevens Revocable Trust*, 2005 MT 106, ¶ 13, 327 Mont. 39, ¶ 13, 112 P.3d 972, ¶ 13; *Montana Metal Buildings, Inc. v. Shapiro*, 283 Mont. 471, 474, 942 P.2d 694, 696 (1997).

8

¶16 We review a district court's findings of fact to determine whether the findings are clearly erroneous. *Leffingwell Ranch, Inc. v. Cieri*, 276 Mont. 421, 430, 916 P.2d 751, 756 (1996); *Solem v. Chilcote*, 274 Mont. 72, 76, 906 P.2d 209, 211-12 (1995). The court's findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with the definite and firm conviction that a mistake has been committed. *Ray v. Nansel*, 2002 MT 191, ¶ 19, 311 Mont. 135, ¶ 19, 53 P.3d 870, ¶ 19.

## DISCUSSION

¶17 *Issue 1. Are the Andersons' claims barred on equitable grounds?*

¶18 Stokes contends that the Andersons' claims are barred by the doctrines of laches and estoppel. We will address these doctrines in turn.

### Laches

¶19 Laches is an equitable doctrine by which a court denies relief to a claimant who has unreasonably delayed or been negligent in asserting a claim, when the delay or negligence has prejudiced the party against whom relief is sought. *Montanans for Justice v. State ex rel. McGrath*, 2006 MT 277, ¶ 23, 334 Mont. 237, ¶ 23, 146 P.3d 759, ¶ 23 (citing *Black's Law Dictionary* 879 (Bryan A. Garner ed., 7th ed., West 1999), and *Cole v. State ex rel. Brown*, 2002 MT 32, ¶ 24, 308 Mont. 265, ¶ 24, 42 P.3d 760, ¶ 24). Laches is not simply a matter of elapsed time; it is also a question of the inequity of permitting a claim to be enforced. Therefore, for laches to apply, the court must find lack of diligence by the party against whom the defense is asserted *and* prejudice to the party

9

asserting the defense. *In re Marriage of Deist*, 2003 MT 263, ¶ 17, 317 Mont. 427, ¶ 17, 77 P.3d 525, ¶ 17; *accord Gue v. Olds*, 245 Mont. 117, 120, 799 P.2d 543, 545 (1990). Because laches is an affirmative defense, *see* M. R. Civ. P. 8(c), the party asserting the defense bears the burden of proof, *see Wareing v. Schreckendgust*, 280 Mont. 196, 211, 930 P.2d 37, 46 (1996).

¶20 In the case at hand, the District Court rejected Stokes's laches defense, reasoning that Stokes had made no showing of prejudice as a result of the Andersons' allegedly unreasonable delay in asserting their claims. In this regard, the court noted:

> In [Stokes's] brief, counsel simply states: "the prejudice to John Stokes would be to destroy his radio station." There is no explanation nor evidence of how complying with the terms of the easement to bury all the lines, conduits, etc., would destroy the station. This is simply a conclusory, cavalier statement made without any evidence.

The court also noted that there had been testimony from Stephen Breeze, a former owner of KGEZ, that "Stokes got a discounted sales price on the station, due to the condition of the station, which includes the towers, and the above ground conduits, etc."

¶21 On appeal, Stokes cites a number of authorities for the proposition that laches applies in this case, including § 1-3-218, MCA ("The law helps the vigilant before those who sleep on their rights."), and *Murray v. Countryman Creek Ranch*, 254 Mont. 432, 838 P.2d 431 (1992). However, in his analysis of this issue, Stokes focuses solely on the question of whether the Andersons unreasonably delayed in asserting their claims and ignores entirely the question of whether he has been prejudiced by the alleged delay.

¶22 In *Kelleher v. Board of Social Work Exam'rs*, 283 Mont. 188, 939 P.2d 1003 (1997), we did not reach the issue of whether the plaintiff had been negligent in asserting

10

her claim and we did not address her explanations for the delay. We explained that "[i]n order to apply the doctrine of laches, a showing must be made that the passage of time has prejudiced the party asserting laches or has rendered the enforcement of a right inequitable," and the defendant in that case had not made such a showing. *Kelleher*, 283 Mont. at 191, 939 P.2d at 1005.

¶23 The same reasoning applies here. Stokes points to no evidence in the record that would constitute the required showing of prejudice for application of the doctrine of laches. Therefore, we need not reach the issue of whether the Andersons unreasonably delayed or were negligent in asserting their claims. We hold that the District Court did not err in denying Stokes's motion for summary judgment based on the defense of laches.

<u>Estoppel</u>

¶24 Stokes argues that the Andersons' claims are also barred by the doctrine of estoppel. The Andersons address Stokes's argument on the merits, but they also assert, as a preliminary matter, that "Stokes never raised this argument in his briefing on summary judgment for this matter." They contend, therefore, that we should not address Stokes's estoppel argument, given our statement in *In re A.C.*, 2004 MT 320, ¶ 16, 324 Mont. 58, ¶ 16, 101 P.3d 761, ¶ 16, that "we do not consider issues raised for the first time on appeal." Having reviewed the record in this case, however, we conclude that Stokes has preserved the estoppel issue for appeal.

¶25 In his answer to the Andersons' complaint, Stokes asserted as his "FIRST AFFIRMATIVE DEFENSE" that "[the Andersons'] claims are barred by the doctrines of laches, estoppel, and/or waiver." However, when he argued this defense in subsequent

11

filings, Stokes focused almost exclusively on laches. Indeed, he explained in his October 15, 2002 brief in support of his motion to dismiss Count I:

> We will not burden this brief or this Court with legal analysis of the other affirmative defenses contained in John Stokes' answer. Suffice to say the rationale and principles of laches are so precisely pertinent to this case that no further citation of other defenses and the law would serve any useful purpose.

Were this Stokes's final word on the matter, we likely would agree with the Andersons that he did not preserve the issue of estoppel for appeal. As it turns out, however, Stokes presented an argument concerning estoppel in his November 14, 2002 Motion and Brief to Alter and Amend Order of October 29, 2002. Indeed, he presented almost verbatim the same argument he now asserts on appeal. We conclude, therefore, that Stokes has preserved the estoppel issue for appeal, and we will proceed to consider the merits of Stokes's contentions.

¶26 Stokes informs us that before he purchased the radio station and its property, land, and easement, he "exercised due diligence which established that the easement covered the 160 acre tract." Thus, "[w]hen John Stokes acquired ownership in April of 2000 he believed he was buying an easement on the 160 acre tract." He contends that "[n]either the Andersons nor anyone else told him the easement was restricted and he should not expand and increase his transmission power. In fact, . . . the conduct of the [Andersons] was totally contrary to their present position." In this regard, Stokes points out that in 1992, the Andersons' predecessors in interest obtained from Stokes's predecessors in interest a release of a portion of the easement, which was done in conjunction with the sale of a parcel of land within the original 160 acres. Stokes also notes Douglas G.

Anderson's statement, during his September 13, 2002 deposition, that the previous owners of KGEZ were "more than willing" to release property from the easement. From this, Stokes reasons that the Andersons "knew that the radio station considered all 160 acres to be subject to the easement. . . . Otherwise, why would releases of the easement on certain parcels sold by the Andersons be required?" Relying on *Kelly v. Wallace*, 1998 MT 307, 292 Mont. 129, 972 P.2d 1117, Stokes argues that the Andersons, therefore, "by their previous conduct are estopped from now contending the easement is restricted."

¶27    In *Kelly*, we explained equitable estoppel as follows:

> Equitable estoppel is based on the principle that a party cannot, through his intentional conduct, actions, language, or silence, induce another party to unknowingly and detrimentally alter his position and then subsequently deny the just and legal consequences of his intentional acts. For that reason, an equitable estoppel claim rests on the concealment or representation of facts by the estopped party.

*Kelly*, ¶ 43 (internal quotations marks omitted). The party who asserts equitable estoppel bears the affirmative burden of proving the following six elements:

> "(1) there must be conduct, acts, language, or silence amounting to a representation or concealment of material facts; (2) these facts must be known to the party estopped at the time of his conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him; (3) the truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time it was acted upon by him; (4) the conduct must be done with the intention, or at least with the expectation, that it will be acted upon by the other party, or under the circumstances that it is both natural and probable that it will be so acted upon; (5) the conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it; and (6) he must in fact act upon it in such a manner as to change his position for the worse."

*Kelly*, ¶¶ 40, 43 (quoting *Dagel v. City of Great Falls*, 250 Mont. 224, 234-35, 819 P.2d 186, 192-93 (1991)). The party asserting equitable estoppel must argue that each of these elements is present and provide evidence in support. *See Wareing v. Schreckendgust*, 280 Mont. 196, 211-12, 930 P.2d 37, 46 (1996).

¶28 Here, Stokes has failed to argue that each of the foregoing six elements is present and to provide evidence in support. In this respect, the case at hand bears a striking similarity to *Wareing*, in which we rejected the defendant's assertion that the plaintiffs should be estopped from asserting their prescriptive easement claim. In so doing, we observed that the defendant had not developed or fully argued any of the six elements of equitable estoppel, either in the district court or in this Court on appeal. In fact, the defendant had failed to even identify the elements and instead had relied on a simple conclusory statement that because the plaintiffs had acknowledged the superior rights of the defendant's successor, they should be estopped from denying the superior rights of the defendant himself. We reasoned that "[i]t is Schreckendgust's burden, not this Court's, to establish that the elements of estoppel are met, and we conclude that Schreckendgust has failed to meet his burden in this case." *Wareing*, 280 Mont. at 212, 930 P.2d at 46-47.

¶29 A similar paucity of argument and supporting evidence afflicts Stokes's estoppel analysis. Stokes has neither developed nor argued any of the six elements set forth above. In fact, he has failed to even identify those elements in his brief and instead has merely quoted other passages from *Kelly*. Furthermore, Stokes has failed to provide any evidence bearing on the six elements. For instance, he has provided no evidence that the

14

Andersons concealed the extent of the easement from him or that the Andersons represented the easement as covering all 160 acres. In this regard, the 1992 release and the dubious inferences drawn by Stokes from Douglas G. Anderson's deposition testimony concerning other possible releases are inapposite. There is absolutely no evidence in the record that the Andersons obtained releases with respect to land lying *outside* the 31.288 acres on which the two radio towers stand or that Stokes relied on such conduct on the part of the Andersons in his decision to purchase KGEZ.[1] Moreover, Stokes acknowledges that he "exercised due diligence which established that the easement covered the 160 acre tract," thus suggesting that he acted based on his own investigation of the facts and not on a representation or concealment of facts by the Andersons.

¶30 The party moving for summary judgment has the initial burden of establishing the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Hi-Tech Motors v. Bombardier Motor Corp.*, 2005 MT 187, ¶ 32, 328 Mont. 66, ¶ 32, 117 P.3d 159, ¶ 32. Stokes has failed to satisfy this burden with respect to his estoppel defense. Accordingly, although the District Court did not address this defense specifically (the court addressed laches but not estoppel), we conclude that the court, nevertheless, correctly denied Stokes's Motion and Brief to Alter and Amend Order of

---

[1] Directing our attention to COS 2829 and the terms of the 1992 release, the Andersons inform us that the 1992 release was necessary because the Andersons' predecessors wanted to sell a parcel of land *over which the ground radials from the towers extended*. The Andersons state, however, that many properties within the original 160 acres, but outside the historic location of the towers, were sold without first obtaining releases from Stokes's predecessors in interest.

October 29, 2002, based on equitable estoppel. We therefore affirm the court's judgment with respect to this particular issue. *Cf. Clark v. Eagle Systems, Inc.*, 279 Mont. 279, 286, 927 P.2d 995, 999 (1996) ("We affirm district court decisions which are correct regardless of the court's reasoning in reaching the decision.").

¶31 ***Issue 2. Did the District Court err in its construction of the instrument by which the Andersons' predecessors in interest granted an easement to Stokes's predecessors in interest?***

¶32 The breadth and scope of an easement are determined by the actual terms of the grant. *Mary J. Baker Revocable Trust v. Cenex Harvest States, Cooperatives, Inc.*, 2007 MT 159, ¶ 18, ___ Mont. ___, ¶ 18, ___ P.3d ___, ¶ 18; § 70-17-106, MCA ("The extent of a servitude is determined by the terms of the grant or the nature of the enjoyment by which it was acquired."). The construction of a writing granting an interest in real property, in turn, is governed by the rules of contract interpretation. *Baker Revocable Trust*, ¶ 18; § 70-1-513, MCA ("Grants are to be interpreted in like manner with contracts in general, except so far as is otherwise provided in this part."). Thus, we begin by setting forth a number of the rules of contract interpretation that are pertinent to the issue discussed below.

¶33 The interpretation of a contract is a question of law. *Ophus v. Fritz*, 2000 MT 251, ¶ 19, 301 Mont. 447, ¶ 19, 11 P.3d 1192, ¶ 19; *Van Hook v. Jennings*, 1999 MT 198, ¶ 10, 295 Mont. 409, ¶ 10, 983 P.2d 995, ¶ 10. Likewise, whether an ambiguity exists in a contract is a question of law. *Mularoni v. Bing*, 2001 MT 215, ¶ 32, 306 Mont. 405, ¶ 32, 34 P.3d 497, ¶ 32; *SVKV, L.L.C. v. Harding*, 2006 MT 297, ¶ 43, 334 Mont. 395, ¶ 43, 148 P.3d 584, ¶ 43. "A contract must be so interpreted as to give effect to the

16

mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28-3-301, MCA. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible . . . ." Section 28-3-303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA. If the language of a contract is unambiguous—i.e., reasonably susceptible to only one construction—the duty of the court is to apply the language as written. *Ophus*, ¶ 23; *Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996). With these principles in mind, we now turn to Stokes's contentions.

¶34     The parties seem to agree that the language pertaining to the location and scope of the easement is unambiguous.[2] However, the parties disagree as to the construction of that language. On this question, the District Court determined that the easement does not encumber the full 160 acres described in the grant but, instead, is limited in size and location to the historical location of the two radio towers—which, according to COS 2829, consists of 31.288 acres (designated as "Tract 2"). Stokes contends that the court

---

[2] Curiously, Stokes states on the one hand that "[w]e do not think there are any ambiguities if the easement contract is read as a whole," but elsewhere in his briefs Stokes twice reminds us that " 'the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist' " (quoting § 28-3-206, MCA). Yet, an uncertainty does not exist where the language is unambiguous. *See Baker Revocable Trust*, ¶¶ 34-36. Thus, if Stokes believes that there are no ambiguities in the grant, then his invocation of § 28-3-206, MCA, is misplaced. Nevertheless, to the extent Stokes means to suggest, as an alternative theory, that an ambiguity *does* exist in the language of the grant, we note the following: first, that Stokes has failed to provide a corresponding argument and, thus, has failed to present this contention properly, *see In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6; M. R. App. P. 23(a)(4), and second, that the language at issue here is, in any event, not reasonably susceptible to the meaning proffered by Stokes, as explained below.

erred in arriving at this construction of the grant and that, properly interpreted, the grant unambiguously created an easement over the full 160 acres.

¶35 As support for this contention, Stokes points out that J.R. and Anna granted "unto the said grantee, his heirs and assigns the perpetual right and easement to erect, construct, operate and maintain radio towers, guy wires and ground and feed wires and conduits in, upon, over and through those certain lands," which are thereafter described as the full 160 acres. Stokes also emphasizes that "[w]e are required to consider the easement document as a whole" and "[a]ll of the language in the easement grant must be considered and respected and reasonably interpreted so as to give recognition to the entire easement."

¶36 It is true that "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA (cited by Stokes). Moreover, as we stated in *Rumph v. Dale Edwards, Inc.*, 183 Mont. 359, 600 P.2d 163 (1979) (also cited by Stokes):

> It is a well-established principle of contractual construction that in interpreting a written instrument, the court will not isolate certain phrases of the instrument to garner the intent of the parties, but will grasp the instrument by its four corners and in the light of the entire instrument, ascertain the paramount and guiding intent of the parties. Mere isolated tracts, clauses and words will not be allowed to prevail over the general language utilized in the instrument. The words of the contract are to be understood in their ordinary and proper sense. [Section 28-3-501, MCA.] Particular clauses of the agreement are subordinate to the general intent of the contract. [Section 28-3-307, MCA.] Any repugnancies in the contract must be reconciled, if possible, by an interpretation which will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the contract. [Section 28-3-204, MCA.] Furthermore, words in a contract which are inconsistent with the general nature of the contract or the main intention of the parties are to be rejected. [Section 28-3-503, MCA.]

18

*Rumph*, 183 Mont. at 368-69, 600 P.2d at 168-69 (some citations omitted). Yet, reading phrases in isolation and contrary to the general intent of the grant is precisely what Stokes is doing here. In rendering his construction of the grant, he conveniently ignores the following crucial language.

¶37 First, the grant states upfront that "it is the desire of the said grantee [Treloar] to erect and maintain certain radio towers, guy wires, ground and feed wires and conduits on *certain portions* of the hereinafter described lands, the exact location of which it is now impossible to determine" (emphasis added). It is unmistakably clear from this language that J.R., Anna, and Treloar intended the radio towers and associated equipment to be constructed on "certain portions"—not "all"—of the 160 acres described in the grant.

¶38 Second, the grant goes on to describe the lands on which the radio towers, guy wires, ground and feed wires and conduits may be constructed, as follows:

> The North Half of the Southwest Quarter (N½SW¼), the Southwest Quarter of the Northwest Quarter (SW¼NW¼) all in Section Twenty-eight (28), Township Twenty-eight (28) North, Range Twenty-one (21) West; also, all of Cliffords Addition to Demersville, being the Southeast Quarter of the Northwest Quarter (SE¼NW¼) said section, township and range.

Given this specific description, it is evident that "the exact location" which was, at the time of the grant, "impossible to determine" was not the 160 acres on which the radio towers *could* be built; rather, it was the "certain portions" of those 160 acres on which the radio towers ultimately *would* be built. Consequently, a construction of the grant under which J.R., Anna, and Treloar intended the easement to cover the entire 160 acres would render the clauses "certain portions of the hereinafter described lands" and "the exact location of which it is now impossible to determine" not only unnecessary, but also

19

inconsistent with J.R. and Anna's supposed intent to grant an easement over the entire 160 acres.

¶39 Along these same lines, the grant provides that "[t]he said grantors, their heirs or assigns are to fully use and enjoy said premises *except for the easement and rights hereby granted*" (emphasis added). Again, if J.R., Anna, and Treloar intended the easement to cover 100% of the lands described in the grant, then the clause preserving J.R. and Anna's right "to fully use and enjoy said premises except for the easement and rights hereby granted" would be inconsistent with that intent. The rules of contract interpretation do not permit such a construction. *See* § 28-3-204, MCA ("Repugnancies in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract."); § 28-3-202, MCA ("The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other.").

¶40 We conclude, therefore, that the grant did not create an easement over the full 160 acres described in the grant. The next question is the extent of the easement actually created.

¶41 In *Leffingwell Ranch, Inc. v. Cieri*, 276 Mont. 421, 916 P.2d 751 (1996), the instruments by which the easements in question had been created did not specifically set forth the extent of those easements. Consequently, in order to ascertain the scope of the easements, we relied on the following principles applicable to such instruments:

20

> "If the easement is not specifically defined, it need only be such as is reasonably necessary and convenient for the purpose for which it was created. It is sometimes held . . . where the grant or reservation of an easement is general in its terms, that an exercise of the right, with the acquiescence and consent of both parties, in a particular course or manner, fixes the right and limits it to that particular course or manner."

*Leffingwell Ranch*, 276 Mont. at 430, 916 P.2d at 757 (ellipsis in original) (quoting *Strahan v. Bush*, 237 Mont. 265, 268, 773 P.2d 718, 720 (1989)). After reciting these principles in *Strahan*, we added that "[w]hat may be considered reasonable is determined in light of the situation of the property and the surrounding circumstances." *Strahan*, 237 Mont. at 268, 773 P.2d at 720; *accord Guthrie v. Hardy*, 2001 MT 122, ¶ 47, 305 Mont. 367, ¶ 47, 28 P.3d 467, ¶ 47. Relying, in part, on *Leffingwell Ranch*, the District Court determined that the easement at issue here is limited in size to the historical location of the two radio towers ultimately selected by Treloar. We agree.

¶42 Because the grant defined the easement merely as "certain portions of the hereinafter described lands" that "[t]he said grantee [Treloar] shall have the right to select," the extent of the easement depends on the following considerations: Treloar's ultimate selection; J.R. and Anna's acquiescence in or consent to Treloar's selection; and what was reasonably necessary and convenient for the purpose for which the easement was created, in light of the situation of the property and the surrounding circumstances. *Leffingwell Ranch*, 276 Mont. at 430, 916 P.2d at 757; *Strahan*, 237 Mont. at 268, 773 P.2d at 720. Evaluating these considerations, we observe that Treloar selected roughly 31 of the full 160 acres on which to construct the radio towers and equipment; that Treloar in fact constructed the towers and equipment on these 31 acres; that J.R. and Anna

21

apparently acquiesced in or consented to Treloar's selection; that the towers have remained in the same location since their construction over 50 years ago; and that the roughly 31 acres selected and used by Treloar was all that was reasonably necessary and convenient for the purpose for which the easement was created—namely, "to expand and reconstruct the facilities and equipment of said radio station KGEZ" and, as part of the expansion and reconstruction program, "to erect and maintain certain radio towers, guy wires, ground and feed wires and conduits on certain portions of the hereinafter described lands."

¶43 We accordingly hold that the District Court correctly determined that the easement is limited in size to the historical location of the two radio towers ultimately selected by Treloar. We next consider the final question of whether Stokes may relocate this easement—without changing its size—to some other portion of the 160 acres described in the grant.

¶44 At the time of the grant, the exact location where the radio towers, guy wires, ground and feed wires and conduits were to be placed was "impossible to determine"; thus, the grant provided that "[t]he said grantee shall have the right to select the place or places at which the above described facilities shall be erected and maintained." As explained already, the said grantee—i.e., Treloar—selected a site and built two radio towers with a corresponding transmission line, wires, conduits, and ground radial antennas on that site in the early 1950s, and the towers and ground radial antennas have remained at that location since their construction.

22

¶45     Stokes contends that the clause giving Treloar the right to select the place or places at which the radio towers and associated equipment will be erected and maintained "simply means that at the beginning of the easement, the grantee and not the grantor will select the location."  Stokes points out that J.R. and Anna also granted "the perpetual right on [sic] ingress and egress to and from said lands for the purpose of erecting, maintaining, repairing, renewing, *altering*, *removing* and *restoring* said radio facilities and equipment when desired by the said grantee *his heirs and assigns*" (emphases added).  Based on this language, Stokes argues that "[i]n order to have that right, which was granted them, it necessarily follows that the altering, removing and restoring would apply to any part of the 160 acres that was described for that purpose."  We disagree.

¶46     First, whereas other provisions of the grant refer to the "grantee, his heirs and assigns," the right to select the place or places at which the radio facilities and associated equipment would be erected and maintained was granted to "[t]he said grantee"— Treloar—alone.  Moreover, nothing in the language relied on by Stokes even intimates that the easement may be relocated anywhere within the 160 acres when desired by Treloar's heirs and assigns.  The words of the grant "are to be understood in their ordinary and proper sense," § 28-3-501, MCA, and we cannot agree that the ordinary and proper sense of "altering," "removing," and "restoring," as used in the grant, is "relocating."  Rather, it seems that Stokes would have the District Court and this Court simply insert the word "relocating" into the grant.  This we may not do.  *See* § 1-4-101, MCA ("In the construction of an instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been

23

omitted or to omit what has been inserted."); *cf. City of Missoula v. Mix*, 123 Mont. 365, 372, 214 P.2d 212, 216 (1950) ("Where the language of a reservation in a grant is clear, certain and unambiguous, it must be given effect as written."). We therefore conclude that the location of the easement is fixed to the historical location selected by Treloar.

¶47 In sum, we affirm the District Court's conclusions that the easement in question does not encumber the full 160 acres described in the grant but, rather, is limited in size and location to the historical location of the two radio towers, described as "Tract 2" on COS 2829. Had J.R., Anna, and Treloar intended for the easement to cover all 160 acres and for Treloar's heirs and assigns to have the right to relocate the radio towers and corresponding wires and conduits to other portions of the 160 acres, they certainly could have used language to accomplish this result. As it is, however, the parties' intention— which we ascertain from the grant taken as a whole, *see* §§ 28-3-202, -303, MCA—was to create an easement in favor of Treloar on certain portions of J.R. and Anna's 160 acres, the size and location of which was to be selected by Treloar based on what was reasonably necessary and convenient to accomplish his stated desire of expanding and reconstructing the facilities and equipment of KGEZ.

¶48 *Issue 3. Did the District Court err in ordering Stokes to bury the wires, ground radial antennas, conduits, and transmission lines at issue here to a minimum depth of 12 inches?*

¶49 In their complaint, the Andersons claimed that Stokes has failed to comply with the terms of the easement grant requiring him "to bury all wires and conduits capable of such burial to a depth of not less than 12 inches" and "to fence all towers and/or guy wires." Specifically, they alleged that many of the buried wires and conduits are not

buried to the required depth; that some of the wires, including the transmission wire, are not buried at all; that the radio towers and guy wires either are not fenced or are fenced but those fences are in such disrepair that they are not serving their function; and that Stokes has refused to bury all wires and conduits to the proper depth, fence the towers and guy wires that are not fenced, and repair the existing fences that are in disrepair. The Andersons ultimately moved for summary judgment on this issue, asking the court to order Stokes to repair the improvements on the easement and otherwise comply with the terms of the grant.

¶50    In its September 29, 2005 order, the District Court determined that there were no questions of fact on the issue of whether the wires and conduits were capable of being buried according to the terms of the grant. In this regard, the court observed that the Andersons had presented evidence that at the time Stokes acquired KGEZ, all lines were capable of being buried and historically had been buried. By contrast, Stokes had not presented any evidence to raise a genuine issue of material fact on this issue. "Simply put, [Stokes] [has] no evidence beyond counsel's argument to rebut [the Andersons'] evidence that the transmission line and any other lines are capable of being buried."[3]

---

[3] In fairness, we note that Stokes did present two affidavits (one from Stokes and the other from Tony Mulligan, KGEZ's engineer) in support of his opposition to the Andersons' motion for summary judgment and in support of his own cross-motion for summary judgment. However, pursuant to a motion by the Andersons, the District Court struck and did not consider certain portions of these affidavits, which the court determined contained "bald, sweeping statements, made without establishing any foundation for making those statements, or . . . not made based on personal knowledge"; statements that were "immaterial and irrelevant"; and a statement by Mulligan that directly contradicted an assertion by Stokes and, thus, rendered the rest of Mulligan's affidavit suspect.

¶51 Likewise, on the issue of interference, the court noted that the Andersons had come forward with evidence demonstrating that their use of the land for agricultural purposes had been disrupted by the exposed condition of the wires and conduits and by Stokes's threats of legal action whenever the Andersons attempted to cut, rake, or bale hay or work the soil in any other fashion. By contrast, Stokes had come forward with nothing more than "bald statements by counsel in briefs on summary judgment," which the court noted "fail to meet the requisite standard for establishing material issues of fact."

¶52 Accordingly, the District Court granted the Andersons' motion for summary judgment on Count III. In its final judgment, the court ordered Stokes to "perform the necessary repairs to the improvements located upon the Easement so as to be in compliance with the terms of the Easement," including "burying all wires, ground radials, conduits and transmission lines to a minimum depth of 12 inches so as not to interfere with [the Andersons'] agricultural activities."

¶53 Stokes asserts that the court's order is erroneous and should be reversed for two reasons. First, he contends that the Andersons' ranching activity removed topsoil and that "[t]hey should have replaced the soil." However, the grant provides that

> [t]he said grantors, their heirs or assigns are to fully use and enjoy said premises except for the easement and rights hereby granted and *the said grantee for himself, his heirs or assigns hereby covenants to bury all wires and conduits capable of such burial to a depth of not less than 12 inches, so that the same will not unduly interfere with the cultivation of said premises, and to fence all towers and/or guy wires for their protection against livestock . . . .* [Emphasis added.]

The emphasized language plainly places the responsibility for burying all wires and conduits capable of such burial on the grantee, his heirs or assigns.

¶54     Stokes apparently is of the view that the wires and conduits capable of burial need only be buried to a depth of at least 12 inches only once, and that he has no duty to rebury any wires and conduits that do not remain at that depth. Nothing in the foregoing covenant or the grant as a whole, however, suggests such a minimal requirement. Indeed, the language suggests precisely the opposite, given that the Andersons "are to fully use and enjoy said premises except for the easement" and that Stokes's wires and conduits are not to "unduly interfere with the cultivation of said premises." Moreover, Stokes's position is contrary to the general rule in Montana that the owner of an easement has not only the right but the duty to keep the easement in repair, and the owner of the servient tenement is under no duty to maintain or repair the easement in the absence of an agreement. *Guthrie v. Hardy*, 2001 MT 122, ¶ 59, 305 Mont. 367, ¶ 59, 28 P.3d 467, ¶ 59 (citing *Laden v. Atkeson*, 112 Mont. 302, 306, 116 P.2d 881, 883 (1941), and 25 Am. Jur. 2d *Easements and Licenses* § 94, at 666-67 (1996)); *see also Koeppen v. Bolich*, 2003 MT 313, ¶ 52, 318 Mont. 240, ¶ 52, 79 P.3d 1100, ¶ 52 ("One having an easement in another's land is bound to use it in such a manner as not to injure the rights of the owner of the servient tenement." (internal quotation marks omitted)). Here, there is no such agreement by the Andersons or their predecessors to keep the easement in repair. Rather, the grant specifically contemplates maintenance by Treloar and his successors: "the said grantors do hereby grant unto the said grantee, his heirs and assigns the perpetual right and easement to erect, construct, operate and *maintain* radio towers, guy

27

wires and ground and feed wires and conduits" (emphasis added). We therefore cannot agree with Stokes's premise that J.R. and Anna granted Treloar an easement over their land that he, his heirs or assigns need not maintain and repair, and we reject Stokes's contention that the Andersons "cannot hold [him] liable if the radial wires are not at least twelve inches (12") below the surface of the easement ground."

¶55    Stokes's second basis for challenging the District Court's order is that the court's underlying finding that the wires, ground radial antennas, conduits, and transmission lines are "capable" of being buried to a depth of not less than 12 inches is clearly erroneous. Stokes maintains that "[a]ll the evidence on this issue is contrary to the [District Court's] finding." As support for this proposition, Stokes boldly asserts that "[i]n the entire record on appeal there is not any evidence that states or tends to establish that the conduit or transmission lines can be buried." This assertion, however, is directly contradicted by Stokes's pleadings with respect to his counterclaims ("When said radio station was constructed in 1949, the ground radial antennae and conduits were buried to a depth of at least 12 inches."), by Stokes's answer to one of the Andersons' discovery requests ("The history of the easement establishes that the ground antennae and transmission were buried to a depth of 12 inches."), and by the deposition testimony of Stephen Breeze, a former owner of KGEZ, who testified that the transmission line and radials were capable of being buried. In addition, while Stokes quotes from page 67 of his September 13, 2002 deposition, where he states that the lines "are not capable of being buried," on page 69 of that same deposition Stokes concedes, after further questioning, that the lines *are* capable

28

of being buried. Thus, contrary to Stokes's assertion, there is evidence in the record stating or tending to establish that the wires and conduits are capable of being buried.

¶56 Stokes also relies on the October 7, 2005 deposition of Tony Mulligan, KGEZ's engineer, in which Mulligan apparently asserted: "It is not possible to bury the existing cables or conduits." However, this deposition, which was taken eight days *after* the District Court ruled on the Andersons' motion for summary judgment on Count III, is not part of the record. Indeed, following the District Court's entry of judgment, Stokes sent a letter to the Clerk of the District Court requesting an order permitting him to file certain depositions, including the Mulligan deposition. The Andersons filed a motion for an order denying Stokes's request, and the District Court granted the Andersons' motion, noting that any discovery obtained or promulgated after summary judgment "obviously is outside the record on which the Court relied for summary judgment and therefore cannot be included as part of the record."

¶57 In *Bahm v. Southworth*, 2000 MT 244, 301 Mont. 434, 10 P.3d 99, we stated that " 'the parties on appeal are bound by the record and may not add additional matters in briefs or appendices.' " *Bahm*, ¶ 11 (quoting *Groves v. Clark*, 1999 MT 117, ¶ 22, 294 Mont. 417, ¶ 22, 982 P.2d 446, ¶ 22). We further stated that we would "not consider such matters in determining whether the [district] court erred in making its findings." *Bahm*, ¶ 11. We therefore struck an affidavit, which was not part of the district court record, from the Southworths' appendix and did not consider it in our resolution of the appeal. *See Bahm*, ¶ 11. Likewise, in the case at hand, we will not consider Mulligan's October 7, 2005 deposition.

¶58 Alternatively, in his reply brief, Stokes directs our attention to Mulligan's July 7, 2005 affidavit, in which Mulligan asserted (as he did in his October 7, 2005 deposition): "It is not possible to bury the existing cables or conduit." The District Court, however, struck and refused to consider this assertion because there was no evidence in the affidavit from which the court could ascertain whether Mulligan had personal or professional knowledge or experience on which to base this assertion. *See* M. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."). Stokes has not provided any basis for concluding that the District Court's reasoning in this regard was erroneous; indeed, Stokes lodges no specific challenge to the court's ruling. We therefore will not consider Mulligan's unsupported assertion in his July 7, 2005 affidavit that "[i]t is not possible to bury the existing cables or conduit."

¶59 In light of the admissible evidence in the record in this case, we conclude that the District Court's finding that the wires, ground radial antennas, conduits, and transmission lines are capable of being buried is not clearly erroneous. Furthermore, we conclude that Stokes, not the Andersons, has the duty to keep the easement in repair. Stokes has not demonstrated that any genuine issues of material fact remain with respect to Count III of the Andersons' complaint or that the Andersons are not entitled to judgment as a matter of law on this claim. We accordingly affirm the District Court's order requiring Stokes to "perform the necessary repairs to the improvements located upon the Easement so as to be in compliance with the terms of the Easement," including "burying all wires, ground

radials, conduits and transmission lines to a minimum depth of 12 inches so as not to interfere with [the Andersons'] agricultural activities."

## CONCLUSION

¶60 The District Court correctly denied Stokes's motion for summary judgment based on the defenses of laches and estoppel. Furthermore, the court correctly determined that the easement in question does not encumber the full 160 acres described in the grant but, rather, is limited in size and location to the historical location of the two radio towers, described as "Tract 2" on COS 2829. Finally, the court correctly granted the relief requested by the Andersons on Count III of their complaint, ordering Stokes to perform the necessary repairs to the improvements located upon the easement so as to be in compliance with the terms of the grant, including burying all wires, ground radial antennas, conduits, and transmission lines to a minimum depth of 12 inches so as not to interfere with the Andersons' agricultural activities.

¶61 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JIM RICE