JUSTICE NELSON,
specially concurring.
¶36 I concur in the Court’s decision. With respect to Issue One, however, my concurrence is with the following caveats.
¶37 The basic facts are as follows. Gibsons possess historical easement rights over land owned by the Developers. The District Court and this Court have recognized those easement rights. Also, the City of Livingston annexed the area in question subject to and with recognition of Gibsons’ prior easements; in other words, the annexation did not extinguish or alter Gibsons’ easement rights. Notably, the diagram attached to the Developers’ May 24, 2005 Petition for Annexation depicts Gibsons’ easement in its historical location across the land to be annexed, and the City’s June 20, 2005 Resolution No. 3641 annexes the land “as depicted on S/D #253,’’which likewise shows Gibsons’ easement in its historical location. Gibsons never consented to the relocation of all or a part of their easement by the Developers. Nevertheless, the Developers unilaterally relocated a portion of Gibsons’ easement, in violation of Montana law.[1] And now the question, as stated by the Court, is “what relief should be fashioned to restore the rights of the easement owner.” Opinion, ¶ 15.
¶38 Ideally, the District Court should have ordered that Prairie Drive be returned to its precise historical location. However, the court believed it was constrained from doing so due to the fact that Gibsons had settled with the City, and correspondingly dismissed their claims against the City, earlier in the litigation. The court thus reasoned in its Order that
[t]he problem the Court face[s] is that this road now belongs to *432 the City of Livingston and the remaining defendants cannot alter or improve Prairie Drive without obtaining approval and permits from the City. Since the City was dismissed from this suit, the Court has no authority to order the City to do anything about the streets in the annexed area at issue.
Given these circumstances, the District Court fashioned a remedy designed to best approximate the relief sought by Gibsons. It ordered the Developers to restore the curves in Prairie Drive to accommodate Gibsons’ historical use of their easement.
¶39 On the specific facts presented here, I believe this remedy will sufficiently restore the easement. As reflected in the diagram following ¶ 4 of the Opinion, the Developers took a 550-foot stretch of Gibsons’ easement (the arch running from Lot 66A, through Lots 65A and 65B, over to Lots 69A, 69B, and 70A) and replaced it with the 450-foot straight stretch running west-east across the diagram. In order to comply with the District Court’s order, the Developers will have to reconfigure Lot 66A or Lot 77A (or both) on the west side, and Lot 69B (and perhaps other neighboring lots) on the east side, of the west-east stretch of Prairie Drive. The end result will be that the road is configured substantially the same as it was before-albeit, with the middle of the west-east stretch located roughly 150 feet south of where it had been.
¶40 However, while I conclude that this remedy is sufficient to restore Gibsons’ easement, I categorically reject the “don’t ask permission; ask forgiveness” approach followed by the Developers in this case. And I do not believe that our decision should be read as countenancing the sort of flagrant violation of easement rights that occurred here.
¶41 As Gibsons point out in their brief, and as the Court reaffirms in ¶¶ 13 and 15 of the Opinion, the law in Montana is that neither the owner of the dominant estate, nor the owner of the servient estate, may ordinarily change the location of all or part of a right-of-way, without consent of the other. Parker v. Elder, 233 Mont. 75, 80, 758 P.2d 292, 295 (1988); see also e.g. Anderson v. Stokes, 2007 MT 166, ¶ 46, 338 Mont. 118, 163 P.3d 1273 (holding that the location of the easement was fixed to its historical location and could not be unilaterally relocated by the owner of the dominant estate). As a matter of fact, this no-unilateral-relocation rule is the majority rule in the United States. See Jon W. Bruce & James W. Ely, Jr., The Law of Easements and Licenses in Land §7:13, 7-31 (Thomson Reuters 2011) (“As a general rule, once the location of an easement has been established, neither the servient estate owner nor the easement holder *433 may unilaterally relocate the servitude.” (citing numerous cases)); Stamatis v. Johnson, 224 P.2d 201, 202-03 (Ariz. 1950); Herren v. Pettengill, 538 S.E.2d 735, 736 (Ga. 2000); Davis v. Bruk, 411 A.2d 660, 664 (Me. 1980); Everdell v. Carroll, 336 A.2d 145, 155 (Md. Spec. App. 1975); A. Perin Dev. Co., LLC v. Ty-Par Realty, Inc., 667 S.E.2d 324, 326-27 (N.C. App. 2008); MacMeekin v. Low Income Hous. Inst., Inc., 45 P.3d 570, 575-76 (Wash. App. Div. 1 2002); Thompson on Real Property vol. 7, §60.04(c)(1)(ii), 538 (2d Thomas ed., Matthew Bender 2006).
¶42 One reason for prohibiting unilateral relocation is that treating the location of the easement as variable “would introduce considerable uncertainty into land ownership and incite litigation.” R.C.R., Inc. v. Rainbow Canyon, Inc., 978 P.2d 581, 588 (Wyo. 1999) (citing Stamatis, 224 P.2d at 203); accord Crisp v. VanLaeken, 122 P.3d 926, ¶ 14 (Wash. App. Div. 2 2005) (“Judicial relocation of established easements ... would introduce uncertainty in real estate transactions.”). Moreover, “the easement holder could be subject to harassment by the servient owner’s attempts to relocate to serve his own conveniences.” R.C.R., Inc., 978 P.2d at 588 (citingDavis, 411 A.2d at 665); accord Bruce & Ely, The Law of Easements and Licenses in Land §7:13, 7-32 (‘The no-unilateral-relocation general rule also protects the easement holder from such developments as capricious adjustments of the easement route by the servient estate owner.”). “[T]he traditional approach-which effectively requires servient landowners to purchase, or obtain by consent, the right to relocate a legally established right-of-way-favors uniformity, stability, predictability and property rights.’ ” Sweezey v. Neel, 2006 VT 38, ¶ 24, 904 A.2d 1050 (quotingMacMeekin, 45 P.3d at 579).
¶43 A handful of courts have fashioned an exception to the no-unilateral-relocation rule, permitting the owner of the servient estate to relocate the easement if the original termini are retained and the easement holder is not materially inconvenienced. See Bruce & Ely, The Law of Easements and Licenses in Land §7:16, 7-37 to 7-38. However, as the Supreme Judicial Court of Maine pointed out, such an exception
would definitely introduce considerable uncertainty into land ownership, as well as upon the real estate market, and serve to proliferate litigation which the general rule as prevails in Maine has tended to prevent. Indeed, the owner of the dominant estate would be deprived of the present security of his property rights in the servient estate and could be subjected to harassment by the *434 servient owner’s attempts at relocation to serve his own conveniences. A unilateral relocation rule could confer an economic windfall on the servient owner, who presumably purchased the land at a price which reflected the restraints existing on the property. Such a rule would relieve him of such restraints to the detriment of the owner of the dominant estate whose settled expectations would be derailed with impunity.
Davis, 411 A.2d at 665.
¶44 Similarly, the Supreme Court of Georgia observed that
[ajllowing unilateral avoidance of the contract by the owner of the servient estate not only would violate fairness principles, it also would create uncertainty in real property law by opening the door for increased litigation over “reasonableness” issues based on today’s conditions rather than those considered in the original bargain. No doubt, when the servitude was first created both parties considered all market factors, including their respective costs and benefits, before agreeing on the consideration for the transaction. If the benefits of relocation become substantial enough, it is the market that should ultimately bring the parties together again, not the courts.
Herren, 538 S.E.2d at 736. Hence, few courts recognize such a standard exception to the no-unilateral-relocation general rule. Bruce & Ely, The Law of Easements and Licenses in Land §7:16, 7-39. And no such exception exists under Montana law.
¶45 Of course, absent an express provision to the contrary in the grant or reservation of the easement, the servient landowner may utilize the established easement area fin any manner and for any purpose that does not unreasonably interfere with the rights of the easement holder.” Bruce & Ely, The Law of Easements and Licenses in Land § 8:20, 8-61 to 8-63; see also Sampson v. Grooms, 230 Mont. 190, 196-97, 748 P.2d 960, 964 (1988). The servient landowner may even impede the easement with a gate if doing so fis necessary for the reasonable use of the servient estate,” “does not interfere with reasonable use of the right-of-way,” and fis not expressly prohibited by the grant [or reservation] of an easement or impliedly prohibited by the surrounding circumstances.” Gabriel v. Wood, 261 Mont. 170, 177, 862 P.2d 42, 46 (1993). But the right to make reasonable use of the servient estate does not include the right to unilaterally relocate the easement, as the authorities cited above establish. See also Bruce & Ely, The Law of Easements and Licenses in Land §7:13, 7-31, §7:17, 7-46 to 7-48.
*435 ¶46 Again, unilateral relocations are disallowed for the following reasons:
1. treating the location of the easement as variable would introduce considerable uncertainty into land ownership, as well as upon the real estate market, and serve to proliferate litigation;
2. the easement holder would be deprived of the present security of her property rights in the servient estate, her settled expectations could be derailed with impunity, and she could be subjected to harassment by the servient owner’s attempts at relocation to serve his own present conveniences;
3. the traditional approach-which effectively requires servient landowners to purchase, or obtain by consent, the right to relocate a legally established right-of-way-iavors uniformity, stability, predictability, and property rights;
4. a rule allowing unilateral relocations could confer an economic windfall on the servient owner, who presumably purchased the land at a price which reflected the restraints existing on the property; and
5. allowing unilateral avoidance of the contract by the owner of the servient estate would open the door for increased litigation over “reasonableness” issues based on today’s conditions rather than those considered in the original bargain.
As the Georgia Supreme Court pointed out, “when the servitude was first created both parties considered all market factors, including their respective costs and benefits, before agreeing on the consideration for the transaction. If the benefits of relocation become substantial enough, it is the market that should ultimately bring the parties together again, not the courts.” Herren, 538 S.E.2d at 736.
¶47 Notably, we already have a rule that “prescriptive easements cannot be relocated by verbal or tacit consent.” Leisz v. Avista Corp., 2007 MT 347, ¶ 16, 340 Mont. 294, 174 P.3d 481 (citing Glenn v. Grosfield, 274 Mont. 192, 196, 906 P.2d 201, 204 (1995)). Rather, the parties must mutually agree in writing to relocate the easement. See Glenn, 274 Mont. at 195-96, 906 P.2d at 203-04. The same rule should apply with even greater force to an easement created in writing, as in the present case.
¶48 Harassment of dominant landowners and breaches of contract through unilateral relocations of easements by servient landowners are contrary to established Montana law under Parker and cannot be tolerated. However, because the remedy ordered by the District Court here will result in Prairie Drive’s being configured substantially the *436 same as it was before, I agree with the Court’s decision to affirm the District Court under Issue One.
¶49 With the foregoing caveats, I specially concur.
JUSTICES RICE and WHEAT join in the Special Concurrence of JUSTICE NELSON.

 At trial, the Developers justified this action on the ground that ‘tannexation] by the City, in our mind, gave us the ability to move this street down here, if we needed to.” This was not the view of the City, however, which sent a letter to the Developers dated May 8, 2006, stating: ‘tl]t is the City’s position that approval of your preliminary plat has no legal effect upon the pre-existing easements.” The City also observed that “[flrom a brief review of the record, it does appear that when you purchased the property you should have been on notice that the property was subject to these easements. The mere fact that you have provided alternative routes does not extinguish these pre-existing easements.”