DA 06-0051

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 228

K&R PARTNERSHIP,

>Plaintiff, Appellee and
>Cross-Appellant.

>v.

CITY OF WHITEFISH,

>Defendant and Appellant.

APPEAL FROM: District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 99-239A
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

>For Cross-Appellant:

>William P. Driscoll, Franz & Driscoll; Helena, Montana

>James H. Goetz, Goetz, Gallik & Baldwin, P.C.; Bozeman, Montana

>For Appellee:

>Sean S. Frampton, Morrison & Frampton, P.L.L.P.; Whitefish, Montana

Submitted on Briefs: August 22, 2007

Decided: June 25, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant City of Whitefish (Whitefish) appeals from the jury verdict and final order of the Eleventh Judicial District, Flathead County, awarding Appellee K&R Partnership (K&R) $161,000 for its inverse condemnation claim and $94,788.23 for litigation expenses. K&R cross appeals, challenging the District Court's decision to disallow "cost to cure" evidence and the court's partial denial of its claimed expenses. We reverse in part, affirm in part, and remand for further proceedings consistent with the opinion herein.

¶2 We consider the following issues on appeal, beginning with the issues raised by Whitefish:

¶3 1. Did the District Court err by misinterpreting the contract between Whitefish and K&R, thereby limiting the issues presented to the jury and precluding Whitefish from introducing evidence that its $130,000 payment and transfer of land to K&R constituted both the value of the condemned property and severance damages?

¶4 2. Did the District Court abuse its discretion by failing to impose reasonable constraints on the property owner's opinion testimony as to the value of his property?

¶5 3. Did the District Court err in granting litigation costs to K&R?

¶6 We then consider issues K&R raises on cross-appeal:

¶7 4. Did the District Court err by precluding K&R's evidence of "cost to cure"?

2

¶8    5. Did the District Court err by awarding interest to K&R from the date of the verdict instead of the date of possession?

¶9    6. Did the District Court err in not awarding K&R property taxes as a necessary litigation expense?

¶10    7. Did the District Court err in refusing to award K&R's expert fees incurred in preparation for the fees and expenses hearing?

## FACTUAL AND PROCEDURAL BACKGROUND

¶11    K&R, a partnership formed by four families, owns real property in the City of Whitefish. Located on the property is a 7,400 square foot commercial building that houses the "Dos Amigos Restaurant" and the "Best Bet Casino." The building is bordered by paved parking areas on all sides with the front of the building facing east. The property's east side is bordered by U.S. Highway 93, which runs north and south. K&R's property is bordered on the west by a vacant lot owned by Whitefish. The Whitefish property is bordered on the west by Baker Avenue, which parallels Highway 93.

¶12    In 1995, the State was widening Highway 93 to four lanes and Whitefish desired to run connector streets from Baker Avenue to Highway 93. In 1997, Whitefish sought to use West 13th Street as a connecter to Highway 93 by extending it from Baker Avenue east to the highway. However, West 13th Street, which was already connected to Baker Avenue, dead-ended into the K&R property. In order to connect West 13th Street to

3

Highway 93, Whitefish sought to condemn 7,234 square feet of the K&R property and construct the extension of West 13th Street thereon. The construction would eliminate K&R's parking lot on the south side of its building but would provide K&R's business with direct access to West 13th Street and an alternate route to and from Highway 93. The condemnation would not permanently affect or alter K&R's pre-existing access to Highway 93. Whitefish entered into negotiations with K&R in order to acquire the 7,234 square feet of K&R's property (Condemned Property).

¶13 K&R and Whitefish were unable to reach an agreement on the value of the property and instead, on October 6, 1998, entered into an "Agreement and Grant of Possession" (Agreement). The Agreement provided that K&R would grant Whitefish possession of the Condemned Property and Whitefish would pay K&R the sum of $130,000 as well as convey to K&R 10,175 square feet of its vacant lot bordering the west side of the K&R property (Conveyed Property). Whitefish also agreed to pave the Conveyed Property so that K&R could use it for parking purposes. The Agreement memorialized these provisions and also stated that the parties were unable to agree on (1) the value of the Condemned Property; (2) the severance damages to the remaining K&R property; and (3) the value of the Conveyed Property. Pertinent to this appeal, the Agreement provided:

> WHEREAS, the parties hereto are, in good faith, unable to agree on the valuation of the Condemned Property, the severance damages to the remainder of Landowner's property, and the value of the property the City

4

is agreeing to convey to the Landowner in partial consideration of the City's taking of Landowner's property for public use, and

WHEREAS, it appears that it may be necessary to resort to litigation to determine such valuations . . . the parties hereto agree as follows:
. . . .

2.   . . . . The parties agree that the City Property conveyed to the Landowner is in the nature of severance damages and is similar in use to that of the Condemned Property, although the parties retain the right to negotiate and litigate the relative values of the City Property and the Condemned Property;
. . . .

13.   That except as to items 2, 8, 9 above, and 18 below, the City agrees not to seek compensation, credit or setoff against the compensation which may be due the Landowner for the Condemned Property; and

14.   That the parties shall have sixty (60) days from the date of execution of this Agreement to negotiate the value of the compensation for the taking of the properties described herein and all impacts of the construction of the 13th Street Extension upon the remaining property of the Landowner and the Landowner's businesses.  All compensation paid or payable to the Landowner other than that specifically allocated in the final compensation agreement or judgment as compensation for the Condemned Property shall be deemed severance damages, compensating Landowner for the decrease in the value of the property it retains that results from construction of the 13th Street connector and the corresponding taking of the Condemned Property.
. . . .

18.   That within ten (10) business days of the date of this Agreement, the City shall pay to Landowner the sum of One Hundred Thirty Thousand and No/100 Dollars ($130,000.00) cash.  The City asserts this, when combined with other consideration passing, to be the full value of both the Condemned Property and all severance damages.  Any additional compensation either negotiated or ordered paid to the Landowner by the City shall bear interest at the rate of Ten Percent (10%) per annum.

5

However, still unable to agree on the valuation of the properties exchanged and severance damages, on May 18, 1999, K&R filed a complaint for inverse condemnation and breach of the Agreement.

¶14 Prior to the jury trial, held July 25-27, 2005, the District Court made several pivotal rulings on motions in limine. First, the District Court decided that the only issue for the jury to determine was the "amount to which K&R [was] entitled as compensation for the land taken." The court reasoned from Item 14 of the Agreement that "[i]t appears from [the] Agreement that [K&R's] severance damages have already been addressed, and it has accepted as payment the $130,000.00, and non-monetary benefits." Accordingly, the jury was not asked to determine the amount of severance damages owed to K&R.

¶15 Second, based on this interpretation of the Agreement, the court granted K&R's motion to preclude Whitefish from admitting "any evidence of the amount of money paid by the City of Whitefish to K&R Partnership for compensation." The District Court again reasoned that Item 14 of the Agreement designated the $130,000 as severance damages only, and therefore could not be considered by the jury in determining K&R's entitlement to compensation for the Condemned Property. As a result, the court ordered Item 18 of the Agreement, referencing Whitefish's payment of $130,000, redacted. The court also disallowed any testimony or other evidence of the $130,000 payment.

¶16 Third, the court disallowed Whitefish from presenting any evidence regarding the Conveyed Property. The court reasoned that because Whitefish had not yet deeded the

6

land to K&R there was no "unity of ownership" between the Conveyed Property and the remaining K&R property. Consequently, the court determined that the Conveyed Property could not be considered when determining the fair market value of K&R's remaining property after the condemnation. Moreover, the District Court stated that even if there was unity of ownership, evidence of the Conveyed Property would be inadmissible because, under the Agreement, it was likewise payment for K&R's "severance damages," which the court had determined was not an issue at trial. Consistent therewith, the District Court disallowed Whitefish's expert appraiser, Steven Hall (Hall), from discussing the "after" value of K&R's remaining property following Whitefish's transfer of the adjoining Conveyed Property. Accordingly, no testimony whatsoever was allowed at trial regarding the Conveyed Property.

¶17    Fourth, the court determined that the "cost to cure damages" sought by K&R were non-compensable because K&R's access to Highway 93 remained unchanged after the condemnation. The court reasoned that because the condemnation resulted in a "reconfiguration" of K&R's parking lot as opposed to a complete loss of access to the highway, K&R's request that the public pay to "reconstruct its building to improve its foot traffic access and to present a more attractive first appearance" was "[c]learly . . . not compensable." Accordingly, the District Court granted Whitefish's motion to preclude any "cost to cure" evidence and subsequently disallowed any evidence of interference with K&R's direct access to Highway 93 during construction.

7

¶18    During the trial, both parties called expert appraisers to testify to the value of the Condemned Property. Whitefish relied on the testimony of expert Hall, who testified that the Condemned Property had a unit value of $8.27 per square foot and concluded that the Condemned Property was worth somewhere between $66,000 and $67,000. K&R's expert Norman Lee testified that the Condemned Property had a unit value of $9.77 and a total value of $70,678.

¶19    K&R also called its managing partner Kent Frampton (Frampton) to testify about the value of the Condemned Property. In reliance on his own analysis of fair market values and commercial sales of property near K&R's property, Frampton testified that the unit value of the property was between $21 and $25 per square foot. Frampton reached this price range by placing values of commercial property on a "trend line" and calculating a "standard deviation" price. Frampton then testified about sales of nearby property, including a dental office, bank, and bowling alley. Whitefish repeatedly objected to Frampton's testimony, arguing that Frampton was not named as an expert witness and was not qualified to testify in this manner. The court overruled Whitefish's objections. Following Frampton's testimony, Whitefish submitted a motion for mistrial. The motion was denied.

¶20    On July 27, 2005, the jury returned a verdict in favor of K&R. The jury determined that Whitefish owed K&R compensation for the Condemned Property in the amount of $161,000. The jury also determined that Whitefish breached the Agreement

8

and granted K&R damages in the amount of $15,833. Whitefish paid K&R the breach of Agreement judgment and that claim is not a part of this appeal. After further motions by the parties, the court entered judgment and set a hearing for determination of K&R's litigation expenses. The District Court ultimately awarded K&R $94,788.23 as litigation expenses. Whitefish appeals and K&R cross-appeals.

## STANDARD OF REVIEW

¶21 The construction and interpretation of an agreement, including whether the contract is ambiguous, is a question of law for the court to decide. *Sec. Abstract & Title Co. v. Smith Livestock, Inc.*, 2006 MT 265, ¶¶ 16-17, 334 Mont. 172, ¶¶ 16-17, 146 P.3d 732, ¶¶ 16-17. We use the abuse of discretion standard when reviewing: (1) the admissibility of evidence, *Perdue v. Gagnon Farms, Inc.*, 2003 MT 47, ¶ 21, 314 Mont. 303, ¶ 21, 65 P.3d 570, ¶ 21; (2) a district court's evidentiary rulings such as decisions on motions in limine, *State ex rel. Mazurek v. Dist. Ct.*, 2000 MT 266, ¶ 7, 302 Mont. 39, ¶ 7, 22 P.3d 166, ¶ 7; and (3) a district court's decision to award or disallow attorney fees, *Gullett v. Van Dyke Constr. Co.*, 2005 MT 105, ¶ 12, 327 Mont. 30, ¶ 12, 111 P.3d 220, ¶ 12. However, where a district court's decision involves a legal question we review the decision to determine if the court correctly interpreted the law. *Mazurek*, ¶ 7.

## DISCUSSION

¶22 **1. Did the District Court err by misinterpreting the contract between Whitefish and K&R, thereby limiting the issues presented to the jury and precluding Whitefish from introducing evidence that its $130,000 payment and**

9

**transfer of land to K&R constituted both the value of the condemned property and severance damages?**

¶23　Whitefish contends that the District Court's interpretation of the Agreement was flawed and thereby erred by excluding evidence of the $130,000 payment and the Conveyed Property and disallowing Hall's testimony regarding the "after" value of the K&R property. Whitefish also challenges the District Court's secondary rationale for excluding evidence of the Conveyed Property, that there was no unity of ownership between the Conveyed Property and K&R's remaining property.

¶24　Whitefish reasons that while it may appear that Items 14 and 18 of the Agreement are contradictory, Item 14 is actually a "default allocation clause" which is easily harmonized with the remaining provisions of the Agreement, and is not ambiguous. Specifically, Whitefish asserts that, when read as a whole, the Agreement allocates the $130,000 payment and the Conveyed Property as compensation for both the Condemned Property and for severance damages. Alternatively, Whitefish argues that if the District Court's interpretation of Item 14 is correct, Item 14 is in direct conflict with Item 18 and the Agreement is ambiguous, requiring us to consider parol evidence to determine the meaning of the Agreement.

¶25　K&R agrees with Whitefish's assertion that the Agreement is unambiguous, but disagrees that the District Court erred in interpreting the Agreement, arguing that the court properly applied Item 14. K&R contends that the $130,000 and the Conveyed Property were severance damages only and that K&R has not been compensated for the

Condemned Property's value. Accordingly, K&R asserts that the District Court properly disallowed evidence of the $130,000 and the Conveyed Property.

¶26 The issue squarely presented is one of contract interpretation. When interpreting a contract we give effect to the "mutual intention of the parties" as it existed at the time the contract was made, so long as that intention is "ascertainable and lawful." Section 28-3-301, MCA (1997)[1]; *Anderson v. Stokes*, 2007 MT 166, ¶ 33, 338 Mont. 118, ¶ 33, 163 P.3d 1273, ¶ 33. The "intention of the parties is to be ascertained from the writing alone if possible[.]" Section 28-3-303, MCA (1997). We view the contract as a whole "so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28-3-202, MCA (1997). We will not isolate tracts, clauses, or words, but rather, we "grasp the instrument by its four corners and in the light of the entire instrument," we ascertain the parties' intent. *Rumph v. Dale Edwards, Inc.*, 183 Mont. 359, 368, 600 P.2d 163, 168 (1979). Any repugnancies existing in the contract "must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract." Section 28-3-204, MCA (1997). Only if the language of a contract is reasonably susceptible to more than one interpretation will the contract be deemed ambiguous and

---

[1] The present action arose in May of 1999 and, at that time, the 1997 MCA was in effect. Statutes do not apply retroactively unless there is legislative intent for them do so, § 1-2-109, MCA (1997), therefore we apply the 1997 MCA to the instant case. *See also Town Pump, Inc. v. Petroleum Tank Release Comp. Bd.*, 2008 MT 15, ¶ 21, 341 Mont. 139, ¶ 21, 176 P.3d 1017, ¶ 21.

require that we review parol evidence to determine the meaning of the writing. *Anderson*, ¶ 33; *Mary J. Baker Revoc. Trust v. Cenex Harvest States, Coops., Inc.*, 2007 MT 159, ¶ 47, 338 Mont. 41, ¶ 47, 164 P.3d 851, ¶ 47; *Habets v. Swanson*, 2000 MT 367, ¶ 13, 303 Mont. 410, ¶ 13, 16 P.3d 1035, ¶ 13.

¶27 Reviewing the contract as a whole, we agree with the parties that the Agreement is unambiguous. However, we conclude that the District Court erred in its interpretation by concluding that the Agreement designated the $130,000 payment and the Conveyed Property as solely severance damages. Before discussing this error in detail, a proper construction of the Agreement is aided by recalling that total compensation in an eminent domain case is made up of two parts: the value of the condemned property and severance damages. *See Mont. Dept. Transp. v. Simonson*, 2004 MT 60, ¶ 17, 320 Mont. 249, ¶ 17, 87 P.3d 416, ¶ 17. The value of the condemned property is the fair market value of the property taken. Section 70-30-302(1), MCA (1997); *Simonson*, ¶ 17. Severance damages constitute the "depreciation in the current fair market value of the property not actually taken but injuriously affected." Section 70-30-302(1), MCA (1997); *see State Hwy. Commn. v. Renfro*, 161 Mont. 251, 257, 505 P.2d 406-07 (1973) (stating the general rule that landowners in eminent domain cases are compensated for depreciation damages resulting from a severance of land); *Simonson*, ¶ 17. Accordingly, severance damages are calculated by determining the difference between the fair market value of the property pre-condemnation and the fair market value of the remaining property post-

12

condemnation.  *Simonson*, ¶ 17; *Renfro*, 161 Mont. at 255, 505 P.2d at 405.  With these principles in mind, we discuss the District Court's error in interpreting the Agreement.

¶28    Although quoting the third "Whereas Clause" of the Agreement in its order, the District Court apparently gave the Whereas Clauses no effect.  However, these clauses clearly reveal that the parties had not reached an agreement regarding the value of either the Condemned Property or the severance damages.  The third and fourth clauses state:

> WHEREAS, the parties hereto are, in good faith, unable to agree on the valuation of the Condemned Property, the severance damages to the remainder of Landowner's property, and the value of the property the City is agreeing to convey to the Landowner in partial consideration of the City's taking of Landowner's property for public use, and

> WHEREAS, it appears that it may be necessary to resort to litigation to determine such valuations . . . .

These provisions demonstrate that the Agreement was premised on the inability of the parties to agree on the values of (1) the Condemned Property, (2) the severance damages, and (3) the Conveyed Property, which was conveyed in partial consideration for the taking.  The Agreement thus set forth a plan to proceed with the land exchange and road project while continuing to negotiate the disputed values, with litigation as a future possibility.  This plan is further affirmed in Item 2, which describes the Conveyed Property (referred to as the "City Property" in the Agreement) as "in the nature" of severance damages, but explains that the parties retain the right to negotiate or litigate the values of the Conveyed Property and the Condemned Property.

¶29    Item 13 states:

13

13.     That *except as to items 2, 8, and 9 above, and 18 below*, the City agrees not to seek compensation, credit or setoff against the compensation which may be due the Landowner for the Condemned Property[.] [Emphasis added.]

Item 13 reinforces the agreed idea that the value of the Condemned Property was undetermined at the time of the Agreement (referencing "compensation *which may be due* the Landowner for the Condemned Property" (emphasis added)).  More importantly, Item 13 provides that Whitefish may seek to offset Items 2, 8, 9, and 18 against the final determination of the Condemned Property's value.  Item 2 describes the Conveyed Property and states that K&R will have the "exclusive right and use" of it; Item 8 indicates that Whitefish will convert the Conveyed Property into a parking area; Item 9 states that Whitefish will "waive any and all fees otherwise chargeable to [K&R] for connection to the City water and sewer system;" and, critically, Item 18 discusses the $130,000 payment, explaining that this payment, "when combined with other consideration passing," is asserted by Whitefish to be "the full value of *both* the Condemned Property *and* all severance damages."  (Emphasis added.)  Thus, Item 13, consistent with the Agreement's other explanations that the parties had not reached an agreement regarding valuations, incorporates Whitefish's position that the "consideration passing" to K&R under the Agreement constituted the total compensation to which K&R was entitled.  Further, Whitefish was allowed to seek an offset for these payments and for the value of the Conveyed Property (Item 2) against any amount later determined to be due to K&R.

14

¶30    Consequently, the jury needed to determine *both* the value of the Condemned Property *and* the corresponding depreciation in the remaining property (or, severance damages) in order to set these values and determine the total compensation due to K&R. Given the District Court's erroneous interpretation of the contract, we conclude that the court erred by limiting the jury to determining only the value of the Condemned Property. All values were in dispute under the Agreement and in need of determination by the trier of fact. Indeed, Item 2 stated that the parties were retaining their right to litigate these values. Accordingly, the jury should have determined the total compensation due to K&R. Thus, the jury's verdict of $161,000 was skewed and a new trial is necessary.

¶31    Moreover, Item 14 of the Agreement is not in conflict with this conclusion. Item 14 provides in pertinent part that "[a]ll compensation *paid or payable* to [K&R] other than that specifically allocated in the final compensation agreement or judgment as compensation for the Condemned Property shall be deemed severance damages . . . ." (Emphasis added.) This is an allocation provision which explains that payments made to K&R, whether provided by the Agreement or paid in the future ("paid or payable"), are to be "deemed" severance damages, unless specifically allocated by a future judgment or final agreement as compensation for the Condemned Property. Contrary to the District Court's conclusion, this language does not mean that Whitefish's payment of $130,000 and transfer of the Conveyed Property to K&R is a settlement of the severance damages claim. No such settlement language is contained in Item 14, and such an interpretation

15

places Item 14 at odds with the provisions addressed above. Rather, Item 14 indicates how payments will be allocated after the Condemned Property is valued.

¶32 Whitefish also challenges the District Court's secondary rationale for excluding evidence of the Conveyed Property. The court ruled that because there was no "unity of ownership" between the Conveyed Property and K&R's remaining non-condemned property, the value of the Conveyed Property could not be considered when determining the value of K&R's remaining property. Whitefish argues that this issue must be resolved for purposes of a new trial, and we agree.

¶33 As stated, the property owner is due, in addition to the value of the Condemned Property, severance damages that equals the "depreciation in the current fair market value of property not actually taken but injuriously affected" by the condemnation. Section 70-30-302(1), MCA (1997). Depreciation is ascertained by calculating the difference between the property value <u>before</u> the take and the remaining property value <u>after</u> the take. *Simonson*, ¶ 17. Prior to determining depreciation, however, the court must ascertain what constitutes the "remainder" in order to accurately ascertain the "before" and "after" values. *See State Hwy. Commn. v. Robertson & Blossom Inc.*, 151 Mont. 205, 219, 441 P.2d 181, 188 (1968). The after value should include any value added to the land as a result of the condemnation. *Lewis & Clark Co. v. Nett*, 81 Mont. 261, 266, 263 P. 418, 419-20 (1928). *See also Renfro*, 161 Mont at 255, 505 P.2d at 405 (explaining that depreciation should be reduced by the "benefits proven" or value added); 26 Am. Jur.

16

2d *Eminent Domain* § 285 (2004) (explaining the "before-and-after" rule as allowing "the deduction of any benefit increasing the market value of the remainder[.]").

¶34 The District Court cited our decisions of *Robertson* and *Renfro* when holding that because K&R did not have a deed to the Conveyed Property there was no "unity of ownership" between the Conveyed Property and the remaining K&R property, and therefore the benefit K&R received from the Conveyed Property could not offset the severance damages. Unfortunately, the court's reliance on these cases was misguided.

¶35 *Robertson* and *Renfro* involved private property owners seeking additional severance damages by claiming that the condemnation of land occurring on one tract of land indirectly adversely affected a separate tract of land. *Robertson*, 151 Mont. at 218-19, 441 P.2d at 188; *Renfro*, 161 Mont at 253-54, 505 P.2d at 404. In *Robertson* we explained that in order for two tracts of land to be considered as one larger tract for purposes of calculating severance damages, three factors must be considered, these are: (1) unity of ownership, (2) unity of use, and (3) contiguity. *Robertson*, 151 Mont. at 219, 441 P.2d at 188. In *Robertson*, the private land owner sought severance damages for an additional piece of property contiguous to the tract where the condemnation occurred. However, because the property on which the condemnation took place was owned by the property owner's corporation, whereas the additional tract of land was owned by the property owner in his individual capacity, we concluded that there was no "unity of ownership" or "unity of use," and therefore the additional property could not be

17

considered as part of the remainder for purposes of calculating severance damages. *Robertson*, 151 Mont. at 219, 441 P.2d at 188-89.

¶36    In *Renfro*, we restated the *Robertson* rule and established an exception to the rule that the property must be contiguous in order to claim severance damages to a separate indirectly and adversely affected tract of land. 161 Mont. at 255, 505 P.2d at 405. There, the property owner's ranch consisted of three separate tracts of land which were not physically adjacent but were connected by a common road. The State sought to condemn a portion of land on Tract 1 and build a highway thereon. The condemnation effectively split Tract 1 into two parcels, making the portion of land on the east side of the highway virtually inaccessible from the west side of the property as well as from the other two tracts of land situated to the west of Tract 1. The property owner argued that all three tracts, while not contiguous to each other, were "so inseparably connected in use that a taking from [Tract 1] must necessarily injure" the other two, "as they operate as one integral unit." *Renfro*, 161 Mont. at 253-54, 505 P.2d at 404. We concluded that while not physically connected, interference with the unity of use may be compensable and was a question for the jury to determine. *Renfro*, 161 Mont. at 258, 505 P.2d at 407.

¶37    Neither *Robertson* nor *Renfro* considered the situation presented today where the condemnor conveys property to the condemnee in an effort to reduce the detrimental effect of the taking. Both of those cases presented the mirror image of the current situation and considered whether the private property owner could increase severance

18

damages by claiming indirect injury to additional property. Because the instant case does not involve a condemnee claiming indirect injury to another parcel of property as a result of the condemnation, neither *Robertson* nor *Renfro* control the outcome, and unity of ownership is not a prerequisite consideration for determining the "remainder."

¶38    Here, Whitefish condemned 7,234 square feet of the K&R property but conveyed to K&R 10,175 square feet of city property contiguous to the K&R lot. Under Item 2 of the Agreement, Whitefish's conveyance of property to K&R was intended as severance damages to offset the harm of condemnation. As explained above, depreciation must be reduced by any value added to the remaining property. A conveyance of replacement property is clearly such an addition of value. Even if replacement property is considered payment for the condemned property, the trier of fact must nonetheless consider the new square footage and features added by the conveyance when determining what depreciation the owner has suffered, as this determination must be based on a "consider[ation] of all the circumstances." *Nett*, 81 Mont. at 266, 263 P. at 420; *see also* 26 Am. Jur. 2d *Eminent Domain* § 272 (2004) (explaining that the measure of depreciation "varies with the facts" and it is "proper to consider all factors indicative of the value of the property[.]"). Thus, when determining depreciation by comparing the "before" and "after" values, the "after" value must take into account the value added by any conveyed replacement property. In sum, it is possible for conveyed property to mitigate or, depending on the value, eliminate severance damages by reducing the

19

amount of depreciation suffered as a result of the condemnation. Accordingly, because depreciation must be reduced by any value added, the District Court erred by disallowing testimony regarding the after value of K&R's remainder as enhanced by the Conveyed Property. The jury must consider all of the circumstances surrounding the condemnation.

¶39 The District Court's misinterpretation of the Agreement and corresponding exclusion of pertinent evidence results in reversible error, requiring a new trial. To provide guidance upon remand, we continue our review of the remaining issues on appeal.

¶40 **2. Did the District Court err in failing to impose reasonable constraints on the property owner's opinion testimony as to the value of his property?**

¶41 Whitefish claims the District Court abused its discretion by not constraining Kent Frampton's testimony. Whitefish argues that while a property owner may testify to the value of his property, he may not "by virtue of his ownership and a general familiarity with real estate in the area, be transmogrified into a full-fledged professional appraiser." Whitefish asserts that this is exactly what happened at trial and, despite repeated objections the District Court allowed Frampton to continue this line of testimony.

¶42 K&R responds that Whitefish's "position leaves no reasonable way to value the land." Though stating at trial that Frampton was not an expert witness, K&R now asserts that "the law is that landowners are considered experts and thus they can rely upon evidence of the sale of similar properties to form the basis for their opinion." K&R's position would allow the landowner to broadly testify as a property expert, with such

testimony to be weighed against other expert opinions, irrespective of the landowner's qualifications in that field generally.

¶43 We utilize a well-settled, two-part "landowner-witness rule" in eminent domain cases, which allows a landowner "to estimate in a reasonable way the value of his property for the use to which he has been putting it." *State Dept. Highways v. Schumacher*, 180 Mont. 329, 337, 590 P.2d 1110, 1115 (1979) (internal quotations omitted). For this purpose, the landowner need not be a "technical expert." *Schumacher*, 180 Mont. at 337, 590 P.2d at 1115. The first part of the rule permits an owner, after a prima facie showing of ownership, to testify to the value of his condemned property so long as (a) his testimony is reasonable and (b) he testifies to the value as it relates to his use of the land. *State Hwy. Commn. v. Marsh*, 175 Mont. 460, 465, 575 P.2d 38, 41 (1978). The second part of the rule requires the landowner to "have some peculiar means of forming an intelligent and correct judgment . . . beyond what is presumed to be possessed by men generally" if he desires to testify to the land's value for purposes other than its current use. *Marsh*, 175 Mont. at 465, 575 P.2d at 41 (ellipsis in original, internal quotations omitted). Before a landowner may testify to the value of his land for other uses, he must lay a foundation that demonstrates the basis for his peculiar or specialized knowledge. *See State Hwy. Commn. v. Barnes*, 151 Mont. 300, 306, 443 P.2d 16, 20 (1968) (noting that personal opinion is not enough to establish a foundation for a landowner's testimony regarding market value of his property); *State Hwy. Commn. v.*

*Donnes*, 187 Mont. 338, 340, 609 P.2d 1213, 1214-15 (1980) (stating that a landowner's testimony was properly disallowed where no foundation was laid demonstrating the property owner's knowledge of calculating depreciation). "Once proper foundation has been laid as to the witness' expertise he should be permitted to give his opinion using any of the accepted means of calculating value." *Schumacher*, 180 Mont. at 335, 590 P.2d at 1114 (internal quotations omitted). The State may then point out any weaknesses in the landowner's valuation on cross-examination. *Schumacher*, 180 Mont. at 335, 590 P.2d at 1114.

¶44 Here, Frampton testified about how he determined the fair market value of the K&R property:

> I looked at the values – the different values that the . . . K&R property has in regards to visibility, traffic count, things like that, then I went out and got a real estate company to give me the comparables, those are the sales that they could find from 1996 through the year 2000[,] of all of the commercial sales in the Whitefish area close to the . . . K&R Partnership property, and I looked at those to determine and develop a trend line that would show me the trend of the value of the different commercial properties in the Whitefish Area.

Frampton thereafter continued describing how he valued the K&R property using the trend line. He stated that he derived a "standard deviation" price and calculated a square foot value for the K&R property of $12.50. He then discussed how he made upward adjustments to this value in order to compensate for other "factors." In so doing, Frampton hinted that his own expert appraiser had incorrectly calculated the value by looking to "comparables" in the wrong time period. After Frampton made these

"adjustments," he valued the K&R property at $21 to $25 per square foot. Throughout his testimony, Frampton compared the K&R property to surrounding properties such as the Dalen Dental Building, Mountain Bank, and a nearby bowling alley that sold for over a million dollars. Whitefish continually lodged objections to this testimony.

¶45 The record indicates that Frampton overstepped the boundaries of the landowner-witness rule. While a landowner may testify about the value of his property and how he arrived at that value, under the first part of the rule, the landowner's testimony may only include a valuation for the uses the property is currently engaged. Here, Frampton's testimony was unreasonable to the extent that he testified beyond the scope of the property's current use. His testimony included the value of a bowling alley, a bank, and a dental office. It was the sale prices of these other properties, all of which were engaged in different uses than the K&R property, which led Frampton to his final valuation of the K&R property. This type of testimony is unreasonable unless the second prong of the landowner-witness rule is met, which requires that Frampton have peculiar knowledge not possessed by the average layman before he testifies about the value of surrounding properties engaged in other uses than the K&R property. *Marsh*, 175 Mont. at 465, 575 P.2d at 41. The burden rests on Frampton to lay a foundation demonstrating this peculiar knowledge. *Barnes*, 151 Mont. at 306, 443 P.2d at 20. As Whitefish correctly pointed out in its objection to Frampton's testimony, Frampton "talked about consulting with realtors and getting comparables and using a computer to run analysis" without indicating

23

any basis or foundation for such expertise. Thus, absent a foundation of peculiar knowledge, Frampton's testimony violated the landowner-witness rule.

¶46 We conclude that the District Court abused its discretion by not constraining Frampton's testimony in a manner consistent with the landowner-witness rule.

¶47 **3. Did the District Court err in granting litigation costs to K&R?**

¶48 Whitefish's last claim on appeal is that the District Court erred in granting K&R's litigation expenses. Whitefish argues that because the judgment must be reversed on the basis of issues one and two, the award for litigation expenses must also be reversed. On this point we agree.

¶49 However, Whitefish further contends that inverse condemnation cases are governed by a "separate and more specific statute"—§ 70-31-303, MCA (1997)—which permits reimbursement of litigation costs <u>only</u> when federal monies are involved. Accordingly, Whitefish asserts that because this is an inverse condemnation case and because "[f]ederal financial assistance was not available for the 13th Street project in Whitefish . . . the award of litigation costs was improper." Whitefish thus asserts that following a new trial, K&R may not recover its litigation costs because litigation costs in inverse condemnation cases are only reimbursable when federal money is involved and federal money was not used in the present condemnation. With this we disagree.

24

¶50    Section 70-31-303, MCA (1997), on which Whitefish relies, is found in Title 70, Chapter 31, MCA (1997), which relates to "relocation assistance" and "fair treatment of condemnees" when federal monies are involved.   The purpose of the chapter is to:

> (1) provide for uniform and equitable treatment of persons displaced from their homes, businesses, or farms *as a result of federally assisted programs*;
>
> (2) establish uniform and equitable land acquisition policies *for federally assisted programs*; and
>
> (3) comply with the *federal* Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended.

Section 70-31-101, MCA (1997) (emphasis added).   Notably, Chapter 31 provides additional provisions applicable to condemnation cases that involve federal money – including § 70-31-303, MCA (1997), which governs inverse condemnation cases specifically.   Whitefish deduces from this provision that because federal money was not involved in the current inverse condemnation case, K&R may not recover litigation expenses.   This conclusion, however, ignores the Montana Constitution and § 70-30-305(2), MCA (1997), which more broadly govern the reimbursement of litigation expenses in eminent domain cases.

¶51    The Montana Constitution, Article II, Section 29 provides:

> Private property shall not be taken or damaged for public use without just compensation to the full extent of the loss having been first made to or paid into court for the owner. *In the event of litigation, just compensation shall include necessary expenses of litigation to be awarded by the court when the private property owner prevails*.   [Emphasis added.]

25

Notably, the Montana Constitution does not distinguish between condemnation litigation initiated by the government entity and condemnation cases initiated by the property owner. *See State Dept. of Highways v. Olsen*, 166 Mont. 139, 148, 531 P.2d 1330, 1335 (1975) (concluding that the intent of Article II, Section 29 of the Montana Constitution was to make the landowner whole to the extent that the judgment would be a "net recovery" if the landowner prevailed). In fact, the Constitution imposes only "two conditions necessary to entitle the condemnee to litigation expenses. They are (1) litigation, and (2) the private property owner prevailing." *State Dept. of Highways v. Standley Bros.*, 215 Mont. 475, 482, 699 P.2d 60, 64 (1985).

¶52    Section 70-30-305(2), MCA (1997), adds that "when the private property owner prevails by receiving an award in excess of the final offer of the condemnor, the court shall award necessary expenses of litigation to the condemnee." The phrase "necessary expenses of litigation" is defined in § 70-30-306(1), MCA (1997), as "reasonable and necessary attorney fees, expert witness fees, exhibit costs, and court costs." These provisions do not distinguish between inverse condemnation and traditional condemnation cases. Moreover, this statute does not refer to the parties as plaintiff and defendant but as condemnor and condemnee. Consequently, there is no apparent intent to limit the award for necessary litigation expenses when the condemnee, as plaintiff, initiates the proceeding. *See Rauser v. Toston Irrigation Dist.*, 172 Mont. 530, 545, 565 P.2d 632, 641 (1977) (noting that in contrast to the remainder of the chapter, which refers

26

to "defendant" and "plaintiff," the terms "condemnor" and "condemnee" are used in the attorney's fee statute, thereby allowing attorney fees in inverse condemnation cases). The only requirement for an award of litigation expenses is that the condemnee prevail by obtaining a judgment in excess of the condemnor's pre-trial offer. *See Rauser*, 172 Mont. at 545, 565 P.2d at 641 (holding "[a]ttorney fees are permissible in inverse condemnation cases in Montana"); *Cf. Galt v. State Dept. Fish, Wildlife, & Parks*, 230 Mont. 327, 331, 749 P.2d 1089, 1092 (1988) (concluding that the condemnee's election to settle the dispute in a declaratory judgment action cannot be used by the State to deny an award of litigation expenses).

¶53 Consequently, we conclude that the award of litigation expenses must be reversed because a new trial is ordered. However, we reaffirm that litigation expenses must be awarded in inverse condemnation cases, where the condemnee prevails as stated in § 70-30-305, MCA (1997).

¶54 **4. Did the District Court err by precluding K&R's evidence of "cost to cure"?**

¶55 K&R's first issue on cross-appeal is that the District Court erred by precluding admission of its "cost to cure" evidence. K&R asserts that the condemnation effectively reduced its parking area on both the front (east) and side (south) of the building. Due to the reduction in parking, K&R complains that its customers must park in the back of the building and enter through the utility door, thereby viewing the industrial side of the building. K&R contends that damages for the condemnation should account for the costs

27

to (1) make the utility door the front entrance; (2) move the utilities to a different location; and (3) remodel the utility interior to appear more like the front entrance.

¶56 "Cost to cure" refers to the costs of corrective work which would restore the property's value. "Where property can be restored to its original condition after its value has been damaged, the measure of damages may, under some circumstances, be measured by the cost of restoration rather than the diminution in value." *State Dept. Transp. v. Fullerton*, 34 P.3d 1180, 1186 (Or. App. 2001). "The 'cost to cure' method is an alternative method of compensation." *City of Great Falls v. Temple Baptist Church, Inc.*, 260 Mont. 319, 322, 859 P.2d 1015, 1017 (1993). Cost to cure evidence helps to establish just compensation but does not create a claim for damages. *Julius L. Sackman, Nichols on Eminent Domain*, vol. 4A, § 14A.04[2], 14A-99 (3d ed., Matthew Bender & Co., Inc. 2007). Rather, cost to cure is "merely evidence of the effect of the taking upon market value and therefore upon diminution in value of the remainder." *Sackman, Nichols on Eminent Domain* at § 14A.04[2], 14A-99. It is properly used as a measure of severance damages when the cost to cure "place[s] the land owner in as good a position as he enjoyed prior to the taking *and is less than the decrease in the market value otherwise caused*." *Sackman, Nichols on Eminent Domain* at § 14A.04[2], 14A-100 (emphasis in original). In sum, "[e]vidence of the cost to cure . . . [is] admissible in order to mitigate the amount of the award: the condemnor is entitled to the adoption of the

28

lesser criterion of damage." *Div. of Admin., State of Fla. v. Frenchman, Inc.*, 476 So.2d 224, 227 (Fla. App. 1985) (citing 5 *Nichols on Eminent Domain* § 23.2 (3d Ed. 1976)).

¶57    We briefly referenced cost to cure evidence in *Temple Baptist Church* and concluded that the trial court "was under no obligation" to allow evidence of this alternative method of calculating severance damages, but that evidence would be admitted in the court's discretion.  260 Mont. at 322, 859 P.2d at 1017.

¶58    Here, we first note that K&R complains of the loss of parking in the front of the building, which occurred, not by this condemnation, but when the State expanded Highway 93 and reclaimed its right-of-way.  Accordingly, the loss of parking in the front of the building cannot be attributed to Whitefish's taking of the Condemned Property and may not be considered when determining severance damages.

¶59    Moreover, K&R offers cost to cure evidence as a separate form of damages, arguing that the property must be cured before depreciation can be determined. Essentially, K&R seeks to recover both the cost to cure and depreciation resulting from the severance.  This is incorrect.  As explained above, cost to cure evidence is an alternate, not an additional, method of computing compensation due to the landowner. Given the purpose for which K&R sought to use cost to cure evidence, the District Court did not abuse its discretion by disallowing cost to cure evidence.

¶60    **5. Did the District Court err by awarding interest to K&R from the date of the verdict instead of the date of possession?**

¶61 The District Court granted interest on K&R's compensation award beginning July 27, 2005—the date of the jury verdict. K&R argues that interest should be awarded from the date of the Agreement and that the "court erred in [its] reasoning and its conclusion." K&R asserts three arguments in support of its position: (1) pursuant to Item 17 in the Agreement, Whitefish must pay "interest at a rate of ten percent on the verdict amount of $161,000 back to the date of the Agreement," which was October 6, 1998; (2) pursuant to § 70-30-302(2), MCA (1997), K&R is owed interest from the date of service of summons, issued here even before the order granting possession; and (3) pursuant to the Montana Constitution, interest on the award is a "necessary expense of litigation" because the Constitution is "clearly broader than" § 70-30-306, MCA (1997) (defining necessary litigation expenses), and entitles K&R to a "net recovery."

¶62 We consider each of K&R's arguments, in reverse order. K&R argues that the Montana Constitution is "clearly broader" than the statutes governing reimbursement of litigation costs. However, K&R raises this argument for the first time on appeal. While K&R asserted in the District Court that the Montana Constitution permitted recovery of interest *on expenses paid*, such as expert witness fees and attorney fees, K&R conceded that "[t]he Agreement and Grant of possession addresses interest that is due on any favorable award to [K&R,]" and did not argue that the Montana Constitution provided broader rights for recovery of interest on the actual award of compensation. Indeed, the District Court's October 5, 2006, findings of fact and conclusions of law stated that the

30

"parties agree that the Agreement and Grant of Possession control [K&R's interest on the award] claim[.]" We have repeatedly stated that "we will not address a party's new argument or a party's change of legal theory on appeal, as it would be 'fundamentally unfair' to fault the District Court in not ruling on an issue never before presented." *Dayberry v. City of E. Helena*, 2003 MT 321, ¶ 24, 318 Mont. 301, ¶ 24, 80 P.3d 1218, ¶ 24. Accordingly, we will not consider K&R's argument that the Montana Constitution provides for recovery of interest on the final award as a necessary litigation expense.

¶63 K&R's second argument is that pursuant to § 70-30-302(2), MCA (1997), interest on the award must be paid "from the date of the service of the summons which would precede the order granting possession." Whitefish responds that § 70-30-302(2), MCA (1997), does not apply to inverse condemnation cases. We agree with Whitefish.

¶64 Section 70-30-302(2), MCA (1997), states that "[i]f an order be made letting the *plaintiff* into possession, *as provided in 70-30-311*, the full amount finally awarded shall draw interest at the rate of 10% per annum from the date of the service of the summons . . . ." (Emphasis added.) In turn, § 70-30-311, MCA (1997), describes the process of putting the plaintiff into possession of the property where the government entity, as condemnor, initiates the proceeding. Thus, by its terms, § 70-30-302(2), MCA (1997), assesses interest when the process described in § 70-30-311, MCA (1997), puts a condemning plaintiff into possession of the condemned property.

31

¶65     As Whitefish argues, this section was not made applicable to inverse condemnation cases where the plaintiff is actually the condemnee.[2] *See Rauser*, 172 Mont. at 545, 565 P.2d at 641 (noting statutory distinctions between use of "plaintiff" and "condemnor").   The process under § 70-30-311, MCA (1997), was not used to put Whitefish, a defendant, into possession.  Rather, Whitefish and K&R voluntarily entered into an agreement which granted possession of the Condemned Property to Whitefish, and thereafter, K&R initiated the action.  Consequently, § 70-30-302(2), MCA (1997), is inapplicable.   Accordingly, the assessment of interest here is, as the District Court concluded, governed by the parties' agreement, and is a matter of contract interpretation.

¶66     We last consider K&R's first argument that, pursuant to the Agreement, interest must be paid from the date of possession, which is likewise the date of the Agreement. K&R contends that Items 17 and 18 repeat the interest clause and because "[i]t doesn't make sense that an agreement this specific on terms would repeat a term . . . [the] only way to harmonize the language is to find that interest from the date of the Agreement was a condition of possessing the land."  (Emphasis in original omitted.)  Whitefish responds that the court correctly interpreted Item 17 as providing that interest was not to run until "the final determination of value" was made—which did not occur until the jury's verdict.  Whitefish also contends that while K&R's redundancy "argument is hard to

---

[2] In 2001, the Legislature amended § 70-30-302(2), MCA, changing "plaintiff" and "property owner" to "condemnor" and "condemnee."

32

follow[,]" the Agreement was "largely drafted by K&R's attorney [and was] so poorly done that an argument based on redundancy is hardly persuasive."

¶67 The Agreement provides:

17. That it is hereby agreed that the City will pay to the Landowner interest at the rate of 10% per annum *upon the <u>final</u> determination of value.* Should any money be paid at this time as another condition of this Agreement, the 10% will not apply on the amount so paid; and

18. . . . the City shall pay to Landowner the sum of One Hundred Thirty Thousand and No/100 Dollars ($130,000.00) cash. The City asserts this, when combined with other consideration passing, to be the full value of both the Condemned Property and all severance damages. *Any additional compensation either negotiated or ordered paid to the Landowner by the City shall bear interest at the rate of Ten Percent (10%) per annum.* [Emphasis added.]

Items 17 and 18 do not conflict. Clearly, pursuant to Item 17, interest began to run once the Condemned Property's value was finally determined. As we have already concluded, at the time the parties entered the Agreement, they had not agreed to the value of the Condemned Property. Therefore, interest did not run from the date of the Agreement or the date of possession. The District Court properly interpreted the Agreement when deciding that interest began on the date of the jury verdict. This amount will need to be recalculated following re-trial.

¶68 **6. Did the District Court err in not awarding K&R property taxes as a necessary litigation expense?**

¶69 K&R next asserts that the District Court erred by not including, in its award of necessary litigation expenses, the amount of $2,118.21, representing the property taxes

33

assessed against the Condemned Property between 1998 and 2005 when Whitefish had possession of the property. K&R relies on § 70-31-302(3), MCA (1997), for the proposition that property taxes are reimbursable. Whitefish responds that because property taxes are not a "necessary cost of litigation" they are non-reimbursable. Alternatively, Whitefish contends that even if property taxes are reimbursable, the transfer of the Conveyed Property to K&R offsets any claimed property tax because K&R, despite its use of the Conveyed Property, has not paid taxes on that property.

¶70 First, K&R's reliance on § 70-31-302(3), MCA (1997), is misguided because, as previously explained, Chapter 31 applies to condemnation proceedings where federal monies are involved, and none are involved here. The award of necessary litigation expenses in condemnation cases not involving federal monies is governed by §§ 70-30-305 and 306, MCA (1997). However, these provisions do not designate property taxes as a necessary cost of litigation, stating that "[n]ecessary expenses of litigation as authorized by 70-30-305 mean reasonable and necessary attorney fees, expert witness fees, exhibit costs, and court costs." Section 70-30-306(1), MCA (1997).

¶71 Nonetheless, § 70-30-315, MCA (1997), separately provides for proration of taxes in condemnation cases, stating:

> The plaintiff shall be assessed his pro rata share of taxes for the land being condemned as of the date of possession or summons, whichever occurs first. The plaintiff shall be assessed for all taxes accruing after the date of possession or summons, whichever occurs first.

34

Here again, the code uses the term *plaintiff* as opposed to *condemnor*. As previously explained, the use of the term *plaintiff* to describe the party condemning the property is an indication that the provision does not apply to inverse condemnation cases where the plaintiff is in fact the condemnee. *See Rauser*, 172 Mont. at 545, 565 P.2d at 641. Therefore we must conclude that § 70-30-315, MCA (1997), is inapplicable in inverse condemnation cases.[3] Accordingly, the District Court did not err by refusing to include property taxes in its final award to K&R.

¶72 **7. Did the District Court err in refusing to award K&R's expert fees incurred in preparation for the fees and expenses hearing?**

¶73 At the hearing to determine litigation expenses, K&R called attorney Dale McGarvey, who testified as an expert witness that K&R's professional fees and expenses incurred prior to the litigation were reasonable and necessary. K&R then claimed the expenses necessary for McGarvey (a total of $1500 for six hours at a rate of $250 an hour) in its calculation of expenses. The court's order did not provide for recovery of McGarvey's fees and K&R appeals that decision.

¶74 In *State Department of Transportation v. Slack*, we stated that "in some circumstances the State may be required to [pay the] condemnee's necessary litigation expenses incurred in proving the amount of costs and fees of the underlying condemnation action[,]" but specifically held that this included "the 'costs and attorney

---

[3] In 2001, the Legislature likewise amended § 70-30-315, MCA, changing "plaintiff" to "condemnor."

fees incurred in proving necessary and reasonable litigation expenses **other than attorney fees.**'" 2001 MT 137, ¶ 31, 305 Mont 488, ¶ 31, 29 P.3d 503, ¶ 31 (emphasis in original) (citing *State v. McGuckin*, 242 Mont. 81, 87, 788 P.2d 926, 930 (1990)). However, we further stated that when it is necessary to "achieve an equitable result in extraordinary circumstances," a district court may in its sound discretion require the payment of attorney fees incurred in proving the amount of attorney fees. *Slack*, ¶ 32.

¶75 Here, we cannot conclude that K&R has demonstrated "extraordinary circumstances" that would lead us to the determination that the District Court abused its sound discretion by denying K&R's request for "fees on fees." Thus, we affirm.

¶76 Reversed in part, affirmed in part, and remanded for a new trial consistent with this opinion.

/S/ JIM RICE

We concur:

/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ JOHN WARNER
/S/ PATRICIA COTTER

36