JUSTICE NELSON
dissents.
¶47 I dissent from the Court’s Opinion. What took place at the restitution hearing violates fundamental fairness. The Court’s decision sets a precedent that will encourage “trial by ambush” tactics and will serve as a disincentive for defendants to cooperate in any presentence investigation (PSI) ordered by the trial court.
¶48 The procedural background of this case deserves to be recounted. To begin with, probation officer Michael Touchette (Touchette) and forensic accountant David Johnson (Johnson), who was qualified as an expert by the trial court, carefully reviewed all available information provided to them by the prosecution and in possession of law enforcement, including the investigating officer’s report. Touchette and Johnson interviewed the parties, including the Crossroads Fitness Center’s owner, Dr. Dennis Wright (Wright), and made a restitution recommendation in the PSI of $12,914.46. Both Touchette and Johnson believed that this was the amount that was provable as criminal conduct by McMaster and his accomplice. They believed that other claims, ranging from $66,000 by the investigating officer to some $300,000 by Wright, were the result of bad business judgment and mismanagement-largely because McMaster was not a businessman-rather than the result of embezzlement or other criminal conduct.
¶49 No additional information was made available to the defense or to the probation officer until fifteen minutes before the restitution hearing was scheduled to commence. At this time, the prosecution faxed to defense counsel a document prepared by Wright with the demand for $334,425 in restitution calculated by “project[ing]... back” the money Crossroads Fitness Center (Crossroads) should have made during 2003, 2004, and 2005. Using a different method-one deemed “less accurate” by Wright-he calculated that the funds stolen from Crossroads, in addition to an accounting fee, totaled $251,118. No supporting documentation was produced then, nor has it been *185 produced since, to substantiate Wright’s claims. Wright’s bare, undocumented demand for $334,425 in restitution was provided to and considered by the court at the restitution hearing.
¶50 At the hearing, Wright offered all sorts of testimony about his claimed losses and how they were calculated. Wright conceded that he was not an accountant, that he had no formal business training, and that he had never conducted a forensic audit. Wright never produced any documentation substantiating his claims, and his figures and recollections were, at best, equivocal in a number of particulars. Indeed, some of his contentions were proven to be flat wrong by Touchette and Johnson.[1] Another prosecution witness, Leigh Ann West Simendinger (Simendinger) likewise testified completely out of the blue. Simendinger apparently had an accounting degree and had passed the CPA exam, but had not activated her license in Montana. She was not qualified as an expert. She produced no written report; testified without producing any records; and admitted that she had not audited Crossroads’ books. She admitted that she was not qualified to give an audit opinion. Indeed, Johnson-who was a forensic accountant and who was qualified as an expert-found her calculations to be “totally irresponsible” without having produced any evidence to support her conclusions. Wright’s and Simendinger’s testimony was admitted over McMaster’s objections.
¶51 As noted in ¶ 19 of the Court’s Opinion, the trial judge settled on a restitution figure of $30,000-not as the amount which McMaster was criminally responsible for, but as the amount he could likely pay. Clearly, the trial court discredited the careful analysis of the defense witness-expert forensic accountant Johnson-and probation officer Touchette, and, instead, credited the off-the-cuff surprise, non-expert, undocumented testimony of Wright and Simendinger.
¶52 Here, Johnson and Touchette, working diligently together from all of the documentary evidence provided to them by the prosecution and *186 from their interviews of witnesses, including Wright, came up with a figure of $12,914.46. Minutes before the restitution hearing was to begin, the prosecution came up with all new numbers and claims by witnesses which had not been disclosed previously by the State. No documentation was ever produced to support the new numbers or the methodology by which these numbers were produced. Some of Wright’s self-serving claims and calculations were demonstrably wrong — which should have cast suspicion on the rest.
¶53 We have previously stated that methods used to calculate restitution-including “ ‘some guess work’ ” on the part of a victim-may be acceptable if the methods utilized were “reasonable based on the best evidence available under the circumstances presented” in the case. State v. Benoit, 2002 MT 166, ¶ 30, 310 Mont. 449, ¶ 30, 51 P.3d 495, ¶ 30 (emphasis added). Here, the methods utilized by Johnson and Touchette were based on the “best evidence available under the circumstances.” Indeed, the $12,914.46 restitution figure they compiled was the only figure supported by documentation. Wright never produced any documentation in support of his self-serving claims for $334,425 or $251,118. Simendinger’s unsupported calculations and methodologies were labeled as “irresponsible” by the forensic accountant. And, many of Wright’s claims were shown to be flat wrong. Accordingly, the trial court’s decision based on the surprise evidence at the restitution hearing was clearly not the best evidence available under the circumstances.
¶54 Moreover, the District Court noted that ‘Wright’s estimate of the total stolen is probably somewhat overstated.” Despite this concession, the court apparently decided that Wright’s estimate of the total amount stolen was “closer to the mark than is the amount of restitution” suggested in the PSI, in large part because the PSI failed to account for “trade outs”-whereby McMaster traded club memberships for goods and services from area businesses. Yet the PSI noted that the problem with calculating the value of trade-outs was that the “club would not have received full membership dues for every individual who was given a trade-out.” The court made no attempt to resolve this issue and instead concluded that McMaster took at least $21,000 from Crossroads in unauthorized trade-outs.
¶55 While this Court takes great pains to note that § 46-18-242(1), MCA, no longer requires documentation in support of a calculation of a victim’s pecuniary loss, the Court conflates consideration of the impact of the crime on a victim with a determination of a victim’s pecuniary loss or restitution amount.
*187 ¶56 A PSI shall contain information on a victim’s pecuniary loss. See § 46-18-112(l)(f), MCA (when a PSI is required, the probation officer shall inquire into and report upon “the victim’s pecuniary loss, if any”); § 46-18-242, MCA (“Whenever the court believes that a victim may have sustained a pecuniary loss,” the PSI shall include a list of the offender’s assets and an affidavit that specifically describes the victim’s pecuniary loss.). If a PSI is not authorized or requested, “the court shall accept evidence of the victim’s loss at the time of sentencing.” Section 46-18-242(2), MCA. Here, there was a PSI. Wright had been interviewed by the probation officer in accordance with § 46-18-112(l)(f), MCA. There were no challenges to the accuracy of the information in the PSI. And, the court was under no obligation to allow, much less credit, Wright’s wild, undocumented, and self-serving claims of pecuniary loss.
¶57 The law also provides that the court “shall permit the victim to present a statement concerning the effects of the crime on the victim, the circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim’s opinion regarding appropriate sentence.” Section 46-18-115(4)(a), MCA. The substance of a victim’s statement concerning the effects of the crime on the victim-which presumably may include a description of how the crime made the victim feel, the loss of sleep suffered by the victim as a result of the crime, the effect on family relationships, etc.-is entirely separate and apart from the calculation of pecuniary loss, which must be “substantiated by evidence in the record.” Section 46-18-243(l)(a), MCA. This calculation must be based on “the best evidence available under the circumstances presented” in the case. Benoit, ¶ 30 (emphasis added).
¶58 Furthermore, § 46-18-243(l)(a), MCA, defines the victim’s pecuniary loss in terms of what could be proven in a civil action under the applicable standard of proof. I am unaware of any civil case that we have ever decided in which this Court affirmed a trial court’s decision that resulted from a situation like the one at issue here-i.e., a party prepares to come to court with his witnesses for a damages hearing; he’s ready to present evidence based on his and his expert’s own investigations, interviews of opposing witnesses, audits of information, and documents and discovery provided by the adverse party; but fifteen minutes before the hearing, the adverse party comes up with entirely new numbers, undisclosed witnesses, no experts, questionable methodologies, and no documents to back any of it up. To make matters worse, the court allows this undisclosed and untested *188 evidence to be admitted over the adverse party’s objection, and then rules on the basis of this information. We would never allow this scenario in a civil context. Wright could not, under any standard of proof that I am aware of, prove his wild, self-serving claims of loss in a civil case in the maimer that the trial court allowed here.
¶59 Unfortunately, this Court, today, says that this sort of practice and procedure is perfectly acceptable in a criminal case. Our decision now serves as precedent for prosecutors and trial judges across the State to do exactly the same thing-sandbag[2] the defense on the morning of the hearing. And, presumably, the State will not be heard to complain when the defendant refuses to cooperate in the presentence investigation, and, instead, shows up at the restitution hearing with a whole plethora of undisclosed witnesses, experts, and expert-wannabes who offer speculative and undocumented, self-serving testimony and hearsay.
¶60 I cannot condone this “trial by ambush” approach. It is unfair; it is antithetical to the search for truth; it discourages cooperation between the parties and the investigating probation officer; it obviates trust and reliance on mutual discovery; it rewards the party who waits until the last minute to prepare his or her case; it encourages sharp practice; it demeans the careful work of the investigating probation officer; it destroys the orderly administration of justice; and, ultimately, it produces an inaccurate and unjust result which is not based on the best evidence available.
¶61 McMaster is entitled to have his restitution obligation reduced to $12,914.46.1 dissent.

 Indeed, compare our decision in a recent civil case involving an inverse condemnation issue, K&R Partnership v. City of Whitefish, 2008 MT 228, 344 Mont. 336,_P.3d_. There we observed that, to comply with the second prong of the “landowner-witness” rule, where a property owner (there a landowner) testifies as to the value of his own property beyond its current use, he must have some peculiar knowledge not possessed by the average layman and must indicate some basis or foundation for Ins claimed expertise. See K&R Partnership, ¶¶ 43, 45. Quite to the contrary, here, Wright admitted no business or accounting experience at all, much less any expertise in computing the forensic loss from a claimed business emhezzlement. In the restitution hearing, however, he was allowed to pull figures out of the air without documentation or foundation using questionable methodologies and proeedures-some of which were demonstrably wrong.

 Ironically, we recently condemned this sort of conduct in another civil case, Nikolaisen v. Advance Transformer Co., 2007 MT 352, 340 Mont. 332, 174 P.3d 940, wherein we stated:
The term “sandbagged,” in the present context derives from the tactic of a poker player to trap another player by checking a strong hand to induce a bet, and then raising once that bet is made. Webster’s Third New International Dictionary, Unabridged 2009 (Philip Babcock Gove, ed., Merriam-Webster, Inc. 2002). In law it has come to mean, inter alia, the practice of unfairly remaining silent concerning an important point in order to lull another party to inaction. See U.S. v. Piélago, 135 F.3d 703, 709 (11th Cir. 1998); State v. Mendoza-Solario, 33 P.3d 411, 416 (Wash. App. Div. 3 2001); DeShields v. State, 534 A.2d 630, 645 (Del. 1987); Gilbert v. K.T.I., Inc., 765 S.W.2d 289,295 (Mo. App. W. Dist. 1988); Wiard v. Liberty Northwest Ins. Corp., 2003 MT 295, ¶ 50, 318 Mont. 132, ¶ 50, 79 P.3d 281, ¶ 50 (Nelson, J., concurring).
Nikolaisen, ¶ 27 n. 1 (Warner, J., specially concurring) (emphasis added).